**Paul WOODWARD, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 092–82.

Court of Criminal Appeals of Texas, En Banc.

Oct. 6, 1982.

On Rehearing En Banc March 7, 1984.

Richard Banks and Thomas M. Booker, Austin, for appellant.

Ronald Earle, Dist. Atty., Philip A. Nelson, Jr., Asst. Dist. Atty., Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Adjudged guilty of deadly assault on a court participant and found to have been previously convicted of a felony, appellant was assessed punishment at confinement for life.[1] Judgment of conviction was affirmed by the Court of Appeals in an unpublished opinion. We granted appellant's petition for discretionary review in order to decide whether the court correctly determined that the trial court did not err in overruling appellant's motion to suppress evidence obtained by what appellant claims is an illegal search of his automobile and in admitting into evidence a pistol seized during the search. The issue is of paramount importance in that the pistol was shown to be the murder weapon, and there is precious little other evidence that appellant killed the deceased, his former girlfriend, as she stood in the doorway of her residence in Austin at an early Saturday morning hour in March.

We are confronted at the threshold by a warrantless stop of appellant as he was driving his automobile through downtown Columbus by a Colorado County Deputy Sheriff. At about five o'clock, just under two hours since deceased had been killed, an Austin-originated bulletin was received by the Sheriff's Office in Columbus, and presumably elsewhere. The "BOLO" was for "1979 Silver Corvette SPB 714 driven by Paul Woodward W/M 26–28" and requested, "If located, hold for questioning ref to homicide occ. this city app. 2:30 am..." Deputy Riehs made the stop on the strength of a radioed report by a Sheriff's dispatcher. As she was reading the bulletin the dispatcher received a transmission from a peace officer in LaGrange that the described automobile had been spotted there en route to Columbus. She relayed this information to all available units and Deputy Riehs responded by proceeding to the intersection of Highway 71 and the main street in Columbus, which is also Highway 90. Shortly he saw the Corvette and pulled in behind it to confirm its license

---

1. Initially appellant was indicted for capital murder, the theory being that he had caused the death of deceased while in the course of committing and attempting to commit burglary. On appeal from a habeas corpus proceeding to fix bail we found that proof of capital murder was not evident. *Ex parte Woodward,* 601 S.W.2d 378 (Tex.Cr.App.1980). Thereafter a grand jury returned an indictment with two counts: the first alleged murder pursuant to V.T.C.A. Penal Code, § 19.02(a)(1), but is fatally defective in that it does not name an accused; the second count alleged in detail an offense under *id.,* § 22.03(a)(2)(B), the essence of which is that appellant assaulted deceased in retaliation for her testifying against him before a grand jury in Smith County that indicted him for criminal mischief.

number; then he turned on overhead lights. Appellant pulled off the street into an area by a closed place of business and got out. Riehs told him the reason for the stop and said, "I'm going to take you on down to the Sheriff's Office so we can get everything straight." He allowed appellant to lock the Corvette where it was parked, telling him that he would bring appellant "right back out here so he could continue on his way if Austin didn't want to hold him..." Appellant was put in the booking room and a teletype message was sent to the Austin Police Department. It requested instructions.[2]

Taking a citizen into custody and to a police station for questioning on less than probable cause to arrest violates the Fourth Amendment as well as Article I, § 9 of the Texas Bill of Rights. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Green v. State*, 615 S.W.2d 700 (Tex.Cr.App.1981). The only reason Deputy Riehs stopped appellant without a warrant is derived from the teletyped BOLO from Austin police; we must, therefore, ascertain what cause Austin officers had. *Whiteley v. Warden*, 401 U.S. 560,[3] 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

The record of hearing on application for writ of habeas corpus by stipulation became the basis for the ruling of the trial court on appellant's motion to suppress. Aside from their personal observations and acts, the investigating officers testified to hearsay information given by persons they interviewed.

The homicide actually occurred about 3:20 a.m. There are no known eyewitnesses to the killing, but at least two persons heard related sounds: Lana Lee, housemate of Patricia Dohnalik, deceased, and Thomas Luchenbach, a neighbor who lived across Laurel Valley Drive. Both reported to investigating officers that there were loud noises of successive knocking or bumping on the front door followed immediately by two or three sounds like gunshots. Dohnalik was found where she had fallen back from the doorway onto carpeting, landing on her right side. Her death was pronounced by EMS personnel within fifteen to twenty minutes. Three spent shells were recovered from the same room. The killer was not seen or heard by anyone, nor was an automobile alien to the neighborhood seen in the area.

Having set the scene of the homicide, we will now paraphrase the facts and circumstances relied on by the State in its brief to show "that probable cause existed to arrest [appellant] under Article 14.04, V.A.C.C.P."

To the first officer who responded Lee, housemate of deceased for several months, said that she suspected appellant was the killer. Lee explained that appellant had been calling the deceased in an attempt to get her to drop criminal mischief charges in Tyler, where the deceased was to testify against appellant in April for cutting her tires. Deceased had been keeping a diary to document evidence in the event something happened to her, and she feared for her life. Appellant had been threatening the deceased.[4] Lee further related that the

---

2. "We have Woodward, Paul Lanier Jr. in custody at this time. Would like to know what to do with him. Also the Corvette." In reply, an unidentified Austin police officer telephoned, saying someone would be sent to Columbus "right away," or the "next couple of hours." Riehs responded that he would book appellant and keep him in jail until Austin officers arrived.

3. "Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Id.,* at 568, 91 S.Ct. at 1037. The test of probable cause for a warrantless arrest by an officer on the strength of a request by another officer is in the information known to the latter. *Tarpley v. State,* 565 S.W.2d 525, 529 (Tex.Cr.App.1978).

4. Neither the nature nor content of any "threat" was ever indicated. Even the officer who retrieved the "diary" that was said by Lee to catalogue them merely "glanced over it" noting, "It

deceased and appellant had lived together and split up, deceased getting a truck and appellant a certain Corvette auto but there was "trouble" over the property division. Lee said that appellant was jealous. When the deceased had dated someone, his tires were slashed by appellant; another of deceased's boyfriends had mysteriously disappeared when he left a party he was attending with deceased for a moment to turn off the dome light of his car. Lee showed officers a Tyler newspaper article regarding the disappearance. It was further stated by Lee that because of her fear of appellant the deceased had moved to Austin to get away from him, that she "felt" appellant carried a gun, and that he (appellant) had been to prison but was on parole or probation.[5] Lee also said that two of appellant's threatening calls to deceased had been made to deceased at her Austin residence. Lee also showed officers contents of a box in deceased's bedroom closet; she disclosed the "diary," a photograph of deceased and appellant, a checkbook with appellant's name and address in Tyler printed thereon, a newspaper clipping from a Tyler paper regarding deceased's boyfriend's disappearance and a reward information and some papers regarding the sale of a Corvette with appellant's name thereon. Lee stated that appellant drove a silver Corvette. The Corvette papers contained a VIN number; a registration check revealed the Corvette was registered to "Woodward Homes" of Tyler and a license number was obtained.

At about 4:00 a.m. a local "pick-up" was put out on appellant and the described automobile. At the same time a teletype to Tyler Police Department requested that they check to see if appellant was home because "... if he was at home, there was no sense in looking at [sic] him any further because there would be no way in that length of time he could have gotten from Austin to Tyler." Apparently, however, Tyler did not respond. Later the BOLO was transmitted statewide.[6] As already indicated, it was received by the dispatcher in Columbus at about five o'clock, and the stop of appellant in his car and seizure of his person followed some thirty minutes later.

The test of probable cause for a warrantless arrest is "at least as stringent as the standards applied with respect to the magistrate's assessment" as a prelude to issuing an arrest or search warrant. *Whiteley v. Warden*, supra, 401 U.S. at 566, 91 S.Ct. at 1035. Applied to all arrests, "without the need to 'balance' the interests and circumstances involved in particular situations," *Dunaway v. New York*, supra, 442 U.S. at 208, 99 S.Ct. at 2254, the long standing test for probable cause remains:

" 'Probable cause exists where "facts and circumstances within their (the officers') knowledge and of which they had reasonable trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed (by the person to be arrested).' *Brinegar v. United States*, 338

didn't really go into specifics as far as I could tell." When it was shown to him the supervising sergeant "just glanced at it" and "didn't even start to read it."

5. Typical of reliability of Lee's reports of such matters, the officer testified that though Lee "felt" appellant carried a gun, "she wasn't sure," and while appellant had been to prison, it was "for, she thought, drunk charges, but she wasn't sure." Of course, on the face of it, Lee was reporting to the officers her recollection of what she had been told by others, mainly the deceased.

6. The decision to "put out a local pickup" on the Corvette and to teletype Tyler police was made about four o'clock at the scene by a uniformed patrol supervising sergeant. He made it based on reports of officers investigating under his supervision; he did not personally talk to Lana Lee. His theory was that finding appellant in Austin or its environs "would increase [his] suspicions" pertaining to appellant. The decision to issue a statewide BOLO was made by a Homicide Detail Sergeant who later arrived on the scene and talked with the uniformed sergeant and other officers. The detective did not testify during the hearing; so, though awareness of all information collected at the scene may be attributed to him, we are left to wonder what motivated him to go statewide. Perhaps it was because the "local pickup" had been fruitless.

U.S. 160, 175–176 [69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879] (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543] (1925)." *Dunaway, id.,* n. 9.

Drawing on the teachings of *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) and *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), we are unable to find probable cause in the information obtained by the investigating officers and their supervisor that, in turn, we attribute to the detective who decided to put out the BOLO statewide. See also *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) and *Irvin v. State*, 563 S.W.2d 920 (Tex.Cr.App.1978).

The request that, if located, appellant be held "for questioning" reflects a quantum of suspicion less than probable cause.[7] At best the record shows no more than appellant was considered a suspect and that the local pickup and statewide BOLO were put out with the hope that he might be located as soon as possible in order to determine the likelihood of his presence in Austin at the time of the killing. An inarticulate hunch, suspicion or good faith is insufficient to constitute probable cause to arrest. *Barber v. State*, 611 S.W.2d 67, 68 (Tex.Cr.App.1981).

Therefore, arrest of appellant by Deputy Riehs, only the strength of the BOLO and his own confirmation of the license number

violated his constitutional rights under the Fourth and Fourteenth Amendments and under Article I, § 9; the evidence secured as an incident thereto—the details of which we need not examine—should have been excluded from his trial. *Whiteley v. Warden*, supra, 401 U.S. at 568–569, 91 S.Ct. at 1037; *Barber v. State*, supra, at 69.

The judgments of the Court of Appeals and of the trial court are reversed and the cause remanded to the trial court.

## OPINION ON STATE'S MOTION FOR REHEARING ON PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Upon original submission, this Court unanimously reversed appellant's conviction for deadly assault on a court participant,[1] upon the ground that the evidence adduced at appellant's bond hearing pursuant to the previous capital murder indictment[2] had been insufficient to meet the State's burden to show probable cause to seize appellant and to search his automobile on the morning of the crime, and that the introduction at trial[3] of the weapon used, which was found in that search, was therefore reversible error.

By its motion for rehearing, the State contends that the facts and inferences available to the three investigating officers and, through them, to their superior jointly

---

7. When the first responding officer characterized his feeling as "strong suspicion," the prosecutor, to her credit, did not attempt to coax him to escalate it upward to probable cause:

"Q: Officer this strong suspicion was based upon information that came from Lana Lee and some from, I guess, Doreen Snyder. But basically from Lana Lee, is that correct? A: That's correct."

1. V.A.P.C., Sec. 22.03(a)(2)(B) provides:

"(a) A person commits an offense if, with a firearm or a prohibited weapon, he intentionally or knowingly causes serious bodily injury:

"(2) to a participant in a court proceeding when he knows or has been informed that the person assaulted is a participant in a court proceeding:

"(B) in retaliation for or on account of the injured person's having exercised an official power or performed an official duty as a participant in a court proceeding." V.A.P.C., Sec. 1.07(a)(37) defines "participant in a court proceeding" to include a witness.

2. The chequered procedural history of what must seem to the lay person, and does seem to this writer, to be a straightforward case of murder is set forth in the Court's original opinion, ante, at footnote one.

3. When appellant renewed, at the opening of the trial, his motion to suppress the fruits of the search of his automobile, the State declined the opportunity to present further evidence upon the issue of probable cause, choosing instead to rely solely upon that evidence adduced at the bond hearing.

and severally provided probable cause to believe at the time the BOLO was issued that appellant had committed the crime which, through the magic of hindsight and further investigation, it is now apparent he had done.

Our original opinion fairly and accurately sets out the facts and inferences available from the record.

Of the information shown to have been available to the police officers, surely the most damning is Lana Lee's statement that appellant had slashed the victim's automobile tires (as well as the tires of a date of the victim; there is no testimony as to the proximity in time of the slashings), that the victim was to testify against appellant the following month in proceedings based upon that event, and that appellant had threatened the victim in telephone calls in which he had attempted to persuade her to drop the charges for slashing. While it is true that the nature of the threats either was not communicated to the officers or was not elicited from them at the hearing, it was adduced that Lana Lee stated that the victim was "obviously" afraid for her life, that the victim had moved to Austin to get away from appellant, and that the most recent threat had come within the last week or two.

From all this we may infer that appellant had displayed a tendency toward violence aimed at the victim and those close to her and that he had a motive for murdering the victim, and for murdering her prior to April 1980. In this context, the threats, whatever their precise content, may be accorded some weight.

Lee's statement that appellant had a criminal record and was known to be violent, and that he was now out of prison either on parole or on probation, was in and of itself of little effect. But that violence was corroborated by appellant's specific acts of tire-slashing, and the criminal record provides further motive for avoiding a second conviction;[4] whether on parole or probation, appellant, by a violation of law

such as might be proved in the tire-slashing case, could face termination of his freedom more easily than might a person who was not on conditional release.

The State now contends that the mere existence of the diary strengthens the claim that the victim feared appellant. Much the same could be said of the entire boxful of personal effects linking the two. But Lee's personal observation of the victim's fear, combined with the move to Austin, the tire slashings and the threats amply establish the victim's unfortunately well-founded fear. The diary provides nothing to further focus a reasonable suspicion upon appellant. Officer Persohn, the only officer to review the diary, testified as follows:

"A. Also, Officer Kornfuehrer had told me about a diary that she had kept. That Lana Lee had told him that she had kept this diary about some—about the ex boy friend threatening her or something. It wasn't real clear at the time. It was just supposed to be a diary of his threats against her or property settlement or something. It'm not real sure what she said it was. And so I went upstairs with Officer Moxley, and we checked the—her bedroom for the diary with Lana Lee inside the closet where she thought it might have been kept. I pulled down a box from the top of the closet. As soon as I pulled it down, the top of it was kind of— she opéned up the top. Lana Lee did. She said, 'Here's the diary.' And it was on three or four pieces of legal pad paper. Long sized, yellow legal pad paper.

"Q. Did you read it?

"A. I didn't read it in great detail. I glanced over it. From what I glanced over—from what I got out of it, she told mostly about splitting up property with him from Tyler,

---

4. In fact, appellant's prior drug (a word which sounds much like "drunk", see original opinion,

n. 5, ante) conviction was used for enhancement purposes in the instant case.

whatever that was over. It didn't really go into specifics as far as I could tell."

The diary itself was not offered in evidence, and it does not appear that an attempt was made to use it to refresh Persohn's recollection.[5]

The disappearance of the victim's date is of even less help. While we can appreciate the victim's suspicion, given her relationship with appellant, that appellant was responsible, and while the further events reflected in the instant case do nothing to dispel that suspicion, we note that even Lee conceded that suspicion of appellant's involvement was precisely that—mere suspicion.

Of course, no matter how strong appellant's motive to murder the victim, if the circumstances surrounding the killing pointed strongly to another person or to another motive, no probable cause would exist to lead a person of reasonable caution and prudence to believe that the instrumentality of the crime would be found in appellant's possession. See *Barber v. State,* 611 S.W.2d 67, 68 (Tex.Cr.App.1981). Thus, had the victim been murdered in circumstances pointing to, or perhaps even compatible with, e.g., rape or robbery, the inference that appellant was likely the assailant would have been vitiated. But the facts are quite to the contrary: knocks on the door, shots fired, the assailant vanishes without being seen or heard.

The circumstances point ineluctably to murder done solely for the sake of killing the victim. Under these circumstances, the threads of inference spun by the prior relationship between appellant and the victim weave a fabric which, while by no means watertight, begins to possess a strength which will support far more than "mere suspicion."

Nonetheless, our prior opinion was quite correct in asserting that the Austin police were without probable cause when the statewide BOLO was issued. At that time, police had failed to find a trace of appellant in Austin; the Tyler police had not yet responded to Austin's request for a check on appellant's home. If appellant had been found at home in bed, or in Timbuktu, at that time, the reasonableness of suspecting that he carried with him an instrumentality of the crime would be nil.

But appellant was neither home in bed nor in Timbuktu, nor even in Las Vegas, where he had attempted to establish an alibi. He was found on a road leading from Austin, driving in a direction away from Austin; he had earlier been seen on the same road, traveling in the same direction. Appellant was found, some two hours after the killing, slightly more than ninety miles from the scene of the crime.[6]

It is this information which the Court, in deciding this case on original submission solely upon the basis of the information available to the Austin police at the time of the issuance of the BOLO, did not consider.

It is true that there is no showing in the record that the Austin police received the bulletin from La Grange which would have made them aware of appellant's whereabouts before he was stopped; it is further true that news of the stopping of appellant in Columbus necessarily arrived in Austin after the stop itself. The questions raised, then, are whether the information known to the Austin police may be added to the

5. We cannot be certain of this because an instrument, marked State's exhibit # 4, was shown to Persohn, who stated that he did not recognize it. No further mention of this exhibit appears in the record.

6. No evidence was offered at the bond hearing to show the distance between Austin and Columbus or to show that any of the officers was aware of that distance. However, judicial notice may be taken of that distance. *Norris v. State,* 115 Tex.Cr.R. 57, 27 S.W.2d 246 (1930); *Leahy v. State,* 111 Tex.Cr.R. 570, 13 S.W.2d 874, 885 (opinion on rehearing) (1929). The arresting officer testified to his knowledge that highway 71, where appellant was stopped, passes through La Grange, where appellant was spotted at 5:15, and Austin; his testimony further shows his familiarity with Colorado County's highways. It would verge on sophistry to argue that he, as well as all of the Austin investigators, might have had no idea whatsoever of the distance from Austin to Columbus.

**344**

information on appellant's whereabouts known to the arresting officer in determining whether there was probable cause to stop appellant and to search his automobile, and, if so, whether the totality of the information did constitute such probable cause.

In *Smith v. United States*,[7] the United States Court of Appeals, District of Columbia Circuit, speaking through Judge Burger, held that:

"... probable cause is to be evaluated by the courts on the basis of the collective information of the police rather than that of only the officer who performs the act of arrestings.

. . . .

".... The correct test is whether a warrant if sought *could have* been obtained by law enforcement agency application which disclosed its corporate information, not whether any one particular officer could have obtained it on what information he individually possessed." (Emphasis in original)

In *Moreno-Vallejo v. United States*, 414 F.2d 901, 904 (5th Cir.1969), it was stated that:

"... The courts have had occasion to recognize that effective police work in today's highly mobile society requires cooperative utilization of police resources. They have, accordingly, asserted that knowledge in one sector of a police system can be availed of for action in another, assuming some degree of communication between the two. *See, e.g., United States v. Pitt*, 382 F.2d 322 (4th Cir. 1967), where the court said (at p. 324) of a contention that the arresting officer must have *personal* knowledge of the facts constituting probable cause:

" '... Probable cause, however, can rest upon the *collective* knowledge of other police, rather than solely on that of the officer who actually makes the arrest...' (Emphasis supplied)." [Emphasis in original]

In *Wood v. Crouse*, 436 F.2d 1077, 1078 (10th Cir.); cert. den. sub. nom. *Wood v. Gaffney*, 402 U.S. 1010, 91 S.Ct. 2193, 29 L.Ed.2d 432 (1971), the court, citing *Smith*, supra, held that "[i]n determining whether probable cause existed we must evaluate the *collective* information of *all* the officers." [Emphasis added.] Unlike *Smith* and *Moreno-Vallejo*, which involved in each case more than one officer from the same federal agency, *Wood*, like the instant case, involved members of different agencies in the same state.

We also note that *Whitely v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971), upon which, inter alia, we relied in reversing on original submission, states, in holding probable cause not to have been shown, that "[t]he arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whitely committed the crime." The clear implication is that such corroboration, if any, should be considered in determining whether probable cause exists.[8]

■ Although the decisions of the United States Courts of Appeals are not binding upon this Court, we find the decisions cited supra to be persuasive, especially in light of the Supreme Court's clear indication in *Whitely*, supra, that the arresting officer's information may be used to corroborate otherwise insufficient probable cause. We hold, therefore, that when there has been some cooperation between law enforcement agencies or between members of the same agency, the sum of the information known to the cooperating agencies or officers at the time of an arrest or search by any of the officers involved is to be considered in determining whether there was sufficient probable cause therefor.

■ That the place in which a suspect is found and the direction in which he is traveling can, taken in combination with strongly founded previous suspicion, lead

7. 358 F.2d 833, 835 (D.C.Cir.); cert. den. 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1966).

8. *Whitely*, like *Crouse* and the instant case, involved more than one law enforcement agency.

to probable cause to arrest him and conduct a search of his automobile has been established at least since *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). In *Carroll*, the suspect, who had a reputation as a bootlegger, and who had earlier agreed to sell unlawful beverages to an undercover officer (but who had reneged on that deal), was seen by the officer and his partner driving along a road leading from Detroit to Grand Rapids. The Supreme Court, judicially noticing that Detroit was an active center for the importation of spiritous liquors, held that there was probable cause to stop and search the suspect's automobile.

In *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), probable cause was held to exist under facts similar to *Carroll*'s: the suspect had previously been arrested for bootlegging by the same officer who spotted him driving his heavily-laden automobile "in a direction from a known source of liquor supply toward a probable illegal market, under circumstances indicating no other probable purpose than to carry on his illegal adventure." 338 U.S. at 166, 69 S.Ct. at 1306.

It must be kept in mind in reviewing a question of sufficiency of probable cause that such a question is a quintessential example of the necessity for case-by-case determination based upon the facts and circumstances shown. In *Smith*, supra, the court stated:

"... As we have often observed, probable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. We weigh not individual layers but the 'laminated' total. It has often been repeated, but it bears repetition, that 'In dealing with probable cause, ... as the very name implies, we deal with *probabilities.* These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States, supra* 338 U.S. at 175, 69 S.Ct. at 1310,

93 L.Ed. 1879. (Emphasis added)" [Emphasis in original] 358 F.2d at 837.

The Supreme Court, in *Brinegar*, set out, in the passage following that quoted in *Smith*, a standard for dealing with the case-by-case determination of probable cause with due consideration of both the individual rights and the collective right to protection of persons:

"... The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions of probable cause 'is a reasonable ground for belief of guilt.' *McCarthy v. De Armit*, 99 Pa.St. 63, 69, quoted with approval in the *Carroll* opinion. 267 U.S. at 161 [45 S.Ct. at 288]. And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C.J., said for the Court more than a century ago in *Locke v. United States*, 7 Cranch 339, 348 [3 L.Ed. 364]. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543].

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing inter-

ests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

"The troublesome line posed by the facts in the *Carroll* case and this case is one between mere suspicion and probable cause. That line necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances." [Footnotes omitted] 338 U.S. at 175–176, 69 S.Ct. at 1310–11.

■ In light of those considerations, and of the facts and circumstances already discussed in our original opinion and in this opinion, including the circumstances of the crime itself, the prior relationship of the parties, and the time and location of the finding of appellant, we hold that, although the State's presentation of matters relating to probable cause appears to leave substantial room for improvement, a minimal showing has been made that the facts and circumstances within the collective knowledge of the officers involved and of which they had reasonably trustworthy information were sufficient to warrant a person of reasonable caution in the belief that appellant had committed an offense and that an instrumentality of the offense might be found in the automobile he drove.

■ Appellant also contends that, even assuming probable cause, the search of the automobile was improper without a showing of exigent circumstances preventing the timely procurement of a warrant. The court of appeals correctly overruled that contention, citing our decision in *Sanchez v. State*, 582 S.W.2d 813, 815 (Tex.Cr.App. 1979), cert. den. 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), and the decision of the United States Supreme Court in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). See, also, *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).[9]

Appellant's final contention is that the evidence failed to show that he knew, as alleged in the indictment, that the victim had been a witness before the grand jury.

■ Evidence was adduced which established that the victim had in fact been a witness before the grand jury and that her name had been endorsed as a witness upon the indictment served upon appellant in that cause. Further testimony revealed that only the names of witnesses before the grand jury, and not those of other potential trial witnesses, are so endorsed. But no evidence was offered that appellant had in fact been informed of the precise meaning of the endorsement.

Further evidence was adduced which showed that appellant was aware that the victim was the complaining witness and the sole witness known to appellant in the cause in which the victim did in fact appear before the grand jury. This evidence includes motions for discovery, continuance, and to take depositions, each signed or sworn to by appellant.[10]

Appellant contends that, while it is certain that the victim was *in fact* a witness before the grand jury, doubt exists whether appellant was aware of that fact. This picture of a guileless appellant is undermined somewhat by testimony describing appellant's constant and often overwhelming attempts to discover the details of the victim's personal life and whereabouts from their mutual acquaintances (who were themselves aware of the victim's having appeared before the grand jury); at any rate, we believe the jury was presented with sufficient evidence to support the find-

---

9. We do not think it unreasonable, given that only two sheriff's deputies were on duty at that time in Colorado County, that the arresting officer performed the arrest, the transportation of the suspect to the sheriff's office, and the search of his car seriatim rather than simultaneously.

10. No evidence was presented before the jury which would support the court of appeals' reliance upon the attempts of appellant and his attorney to negotiate a withdrawal of the charges by the victim. Evidence of such attempts was presented at the bond hearing upon the issue of probable cause, but was not offered by the State at trial.

ing that, in the circumstantial nexus here presented, the only reasonable inference is that appellant was aware of the victim's appearance before the grand jury.

The contention is overruled.

The State's motion for rehearing is granted; the judgment of conviction is affirmed.

ONION, P.J., and ODOM and CLINTON, JJ., dissent.

TOM G. DAVIS, Judge, concurring.

■ I write because I believe there are significant circumstances which go toward establishing probable cause for the arrest of appellant and the search of his car, which warrant further development.

It is clear that officers arriving at the victim's apartment received most of their information from Lana Lee, the victim's roommate. Lee was primarily reporting to the officers her recollection of what she had been told by the deceased.

Unquestionably, Lee was a credible informant.[1] Though not an eyewitness, she was an earwitness to the shooting. As the victim's roommate she possessed special information relevant to the police effort to catch the killer. She eagerly came forward with this information as a citizen-informant and freely gave her name to the police. *Wood v. State*, 573 S.W.2d 207 (Tex.Cr.App.1978); *Avery v. State*, 545 S.W.2d 803 (Tex.Cr. App.1977). See also, *Jaben v. United States*, 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, Sec. 3.4 (1978).

The hearsay information related by the victim to Lee was given credibility by events which occurred subsequent to the giving of such information and prior to appellant's arrest. Convinced that she was marked for execution, the victim told others of her fear. She indeed *was* murdered, adding to her veracity on this and related points.

The Austin police officers were aware of the underlying circumstances upon which Lee based her conclusions. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). It was clear that Lee's knowledge of the events related to police officers came directly from the victim.

The victim's knowledge of these events was obtained firsthand, through her relationship with the appellant. This was the natural and obvious, indeed the only, inference to be drawn from the facts Lee told the police.

In addition to being reliable and based on sufficient knowledge, an informant's information must itself be helpful in terms of establishing probable cause. The following information given by Lee to police officers was significant:

1. Appellant had been calling the deceased in an effort to get her to drop criminal mischief charges in Tyler where the deceased was to testify against appellant who allegedly slashed her tires. [The calls show appellant's motive to kill the deceased. The pending charges tend to show appellant was capable of taking hostile criminal action against the deceased.]

2. Appellant had been threatening the deceased over the phone. Two of the calls that Lee knew of were received in Austin. Because of appellant's threats, the deceased feared for her life. [The obvious inference to be drawn from the above is that the deceased feared for her life, *because* the appellant was threatening *to kill her*.]

3. Because the deceased feared appellant, she moved from Tyler to Austin, [This shows that the deceased did not consider her fears to be frivolous.]

4. Because the deceased feared for her life, she was keeping a diary to "doc-

1. In footnote number 5 of our original opinion there is a suggestion of lack of reliability of Lee's information.

ument" evidence in case something happened to her. [This shows again that the deceased took the threat to her life seriously. An officer later saw the diary and some writing in it which corroborated Lee's story about the diary.]

5. Appellant and the deceased had lived together. There was trouble over a property division when they split up, and appellant was jealous of other men.

6. Appellant drove a silver Corvette.

7. Lee showed officers a box the deceased had kept containing, inter alia, the diary, a photo of deceased and appellant together, appellant's checkbook, a newspaper clipping from a Tyler paper about a date of the deceased who disappeared, and papers relating to the Corvette. [The material in the box corroborated Lee in her statement that appellant and the deceased had a prior relationship and that appellant drove a Corvette. The placement of all of these items in one box is further evidence of the deceased's desire to "document" certain items in the event something happened to her.]

8. The Corvette papers contained a VIN number. Police used this to obtain a license number. A registration check revealed the Corvette registered to Woodward Homes of Tyler. [This further corroborated Lee's information about the Corvette.]

9. Lee told officers that appellant had a criminal record, was on parole or probation, and had a reputation for being violent. [This information was of slight value in the absence of any detailed factual statements about the appellant's past criminal activities. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).]

Police officers also knew, from Lee and the discovery of appellant's checkbook, that the appellant resided in Tyler.

Sifting through the information related by Lee to the police, it can be seen that the material most damaging to the appellant concerned: continuing threats of a serious nature made by appellant against the deceased; appellant's upcoming trial for criminal mischief and the deceased's expected testimony in that trial; the previous relationship that existed between appellant and the deceased and the souring of that relationship; the deceased's real fear that appellant was capable of carrying out his threats, evidenced by her move to Austin and her efforts to "document" appellant's actions towards her.

The murder of the deceased appeared to be an execution-style killing. She was not killed in the course of a separate criminal offense such as a robbery or a sexual assault. Further, there was *no suspect other than the appellant.*

The homicide occurred about 3:20 a.m. The BOLO was received in Columbus at 5:00 a.m.[2] A few moments later appellant's Corvette was seen in La Grange on Highway 71, headed toward Columbus. Appellant's car was spotted at 5:30 a.m. in Columbus on Highway 71 between Highway 90 and Interstate 10.

Thus, before the appellant was stopped, a Colorado County Sheriff's Deputy observed (1) the car noted in the BOLO and referred to by Lee, (2) situated 90 miles from Austin traveling away from Austin on Highway 71 (3) approximately two hours after the Austin homicide.

When these facts were added to the information the Austin police received earlier from Lee, probable cause existed to arrest appellant and to search his car. The spotting of appellant's car in La Grange and Columbus not only tended to corroborate the tips provided by Lee, but also reasonably aroused suspicion when coupled with other circumstances known to officers.

**2.** Though the BOLO placed the time of the homicide at 2:30 a.m., the Austin police officers knew the shooting occurred at 3:20 a.m. Thus, the collective information in the hands of the police was that the homicide occurred at 3:20 a.m.

*Polanco v. State,* 475 S.W.2d 763 (Tex.Cr. App.1972).

Looking at the collective information in police hands at the moment of appellant's arrest, we find:

1. A dead woman.

2. A victim who had feared that her ex-boyfriend (appellant) would kill her.

3. A victim who had taken her fears seriously enough to move to a new city and to "document" evidence against her ex-boyfriend in the event she was harmed.

4. The ex-boyfriend's upcoming trial for criminal mischief against the deceased's property. The ex-boyfriend had made more than one threatening phone call to the deceased to get her to drop charges.

5. The ex-boyfriend had made several threats of a serious nature against the deceased.

6. The deceased and the ex-boyfriend had lived together, and their break-up had not been pleasant.

7. The ex-boyfriend had a criminal record and a reputation for being violent.

8. The deceased was shot to death in an execution-style killing that had as its one purpose her death.

9. There was no suspect other than the ex-boyfriend.

10. The ex-boyfriend was discovered two hours after the shooting on a highway 90 miles from Austin at 5:30 a.m.

11. The ex-boyfriend, a resident of Tyler, was traveling away from Austin on Highway 71. The ex-boyfriend's presence in Columbus at 5:30 a.m. was consistent with his having been in Austin at 3:20 a.m.

These facts and circumstances were sufficient in and of themselves to warrant men of reasonable caution in the belief that an offense had been committed and that appel-

lant had committed the offense. *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed.2d 1879 (1949).

There was also probable cause to search the appellant's car for the murder weapon. Given the circumstances under which he was stopped, the search of the car was proper. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

Accordingly, I concur in the majority opinion on rehearing.

McCORMICK and CAMPBELL, JJ., join in this opinion.

TEAGUE, Judge, dissenting.

The appellate history of this case, which case has received a certain amount of local news coverage, reveals that a panel of the Austin Court of Appeals, in an unpublished opinion by Chief Justice Phillips, unanimously affirmed the conviction of Paul Woodward, appellant.

The panel opinion unanimously rejected appellant's claim that the law prohibited the admission into evidence at his trial crucial evidence, namely, a pistol, that had been seized without probable cause and without warrant from appellant's automobile by Keith Riehs, a deputy sheriff of Colorado County.

I believe it is important to point out that in rejecting appellant's claim and affirming the conviction, the Court of Appeals did not cite or discuss a single case that was on all fours, factually and legally, with appellant's case.

I also point out that the record reflects that a member of the Austin Police Department issued a statewide "BOLO"[1] bulletin for a vehicle suspected of being driven by appellant. A dispatcher with the Colorado County Sheriff's Department received the message and relayed it to Riehs, a patrol officer who was then on duty. When Riehs saw a vehicle traveling through Columbus which matched the description of the vehicle that was contained in the "BOLO" message, he stopped the driver, who was later

---

**1.** The word "BOLO" stands for "be on the lookout."

identified as appellant. Although the "BOLO" message did not authorize any law enforcement official to arrest appellant, nevertheless, soon after Riehs came into contact with appellant, he arrested him and subsequently booked him into the Colorado County jail. Thereafter, Riehs reported to a member of the Austin Police Department what he had done, and that person asked Riehs if he had found a gun inside of appellant's vehicle. Riehs responded he had not. On his own volition, Riehs returned to appellant's stationery automobile, which appears to have been left in a safe place when Riehs took appellant to jail, and, with assistance from a wrecker driver, Riehs entered appellant's automobile. After conducting a search and seize mission, Riehs found and seized a pistol, which finding was reported to an Austin police officer. Thereafter, police officers from Austin came to the Colorado County jail where they obtained custody of appellant and the pistol. The record of appeal does not clearly reflect what happened to appellant's automobile.

After the Austin Court of Appeals affirmed his conviction, pursuant to the appellate law of this State, appellant filed a petition for discretionary review, which petition was subsequently granted by this Court. In a unanimous opinion authored by Judge Clinton, this Court held that the trial court erred when it admitted into evidence the pistol that had been previously seized by Riehs. The unanimous opinion stated, inter alia, the following:

> Therefore, arrest of appellant by Deputy Riehs, on the strength of the BOLO and his own confirmation of the license number [of appellant's vehicle] violated [appellant's] constitutional rights under the Fourth and Fourteenth Amendments and under Article I, Section 9; the evidence secured as an incident thereto—the details of which we need not examine— should have been excluded from his trial. *Whiteley v. Warden,* 401 U.S. 560, 568– 569, 91 S.Ct. 1031 [1037], 28 L.Ed.2d 306; *Barber v. State,* 611 S.W.2d 67, 69 (Tex. Cr.App.1981).

Thereafter, this Court granted the State's motion for rehearing, and today affirms appellant's conviction, holding, among other things, that the trial court did not err in admitting into evidence at trial the pistol that had been seized by Riehs from the interior of appellant's automobile. It also holds that at the time Riehs seized the pistol without warrant he had probable cause to so act.

After carefully studying the majority opinion and reviewing the authorities it cites and discusses, it is obvious to me that a majority of this Court erroneously sustains the rulings of the trial court and the Court of Appeals, by holding that when Riehs seized the pistol he had probable cause to seize the pistol without warrant.

Until today's majority opinion, the law in this State has always been unquestioned as to when an arrest or search made by a law enforcement official pursuant to a "BOLO" message is valid or invalid. The answer to the question, whether the arrest or search is valid, has always depended upon whether the information that was known to the dispatching officer at the time he initiated, transmitted, or sent the "BOLO" message was sufficient to establish probable cause for the warrantless arrest or search.

> The test as to probable cause in such cases where the officers act solely upon a request for arrest is the information known to the officer who requests another officer to effect the arrest. *Colston v. State,* 511 S.W.2d 10, 12 (Tex.Cr.App. 1974).

Thus, until today's majority opinion, if a warrantless arrest or search was made pursuant to a "BOLO" message, and was thereafter challenged, it was incumbent upon the State to establish that the officer who initiated or sent the "BOLO" message had probable cause *at that time* to make a warrantless arrest of the defendant or a warrantless search of a vehicle the defendant was driving when stopped or arrested. If the State failed to establish at a hearing held on the challenge, that probable cause existed at the time the "BOLO" message was sent, then the arrest or search would

be held unlawful. Of course, because of the illegality, any evidence obtained as a result of the arrest or the search became inadmissible at the defendant's trial. *Colston v. State,* supra; *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The reason that police are permitted to use sophisticated technology such as police radio bulletins, in order for one law enforcement agency to communicate with others, is because we have a large and mobile population. To require communication in this day and time to be solely on a human basis would not be practical.

Notwithstanding the feasibility of using police radio bulletins, there is a strong public policy in this State, as in most other States of the Union, against a rule which would permit police officers to initiate an arrest or search and then justify the arrest or search by information in police hands at the time of the arrest, rather than at the time the directive to arrest or detain issued. "To hold [otherwise] would encourage police officers to issue ["BOLO messages" or] "be on the lookout for" memorandums or other directives to arrest on the hope that additional knowledge will be gained which, together with the information at hand, will constitute probable cause. [Citation Omitted]. An argument may be made that it would be overtechnical to require [a police officer] to withdraw his ["BOLO"] memorandum and issue a new one when he secured facts giving him probable cause to arrest. The answer [to that argument] is that no societal or legitimate police purpose exists for encouraging the issuance of a ["BOLO"] memorandum in the first place without probable cause." *People v. Ford,* 150 Cal.App.3d 687, 198 Cal.Rptr. 80, 88 (5th Dist.1984).

In *Whiteley v. Warden,* supra, the Supreme Court of the United States was confronted with a case where an arrest warrant had issued without probable cause. The warrant information was transmitted over a statewide radio network and was received by a sheriff in another county who, pursuant to the broadcast, arrested

the defendant. Several items of evidence were seized and introduced into evidence at the defendant's trial. On appeal, the defendant claimed that the arresting officer did not have probable cause. In accord with what this and other Courts of this Nation had previously stated, the Supreme Court held that the arrest that was made in reliance upon the radio broadcast, which was based on an invalid warrant, was illegal and would not support the search incident to the arrest of the defendant in that cause. The evidence that had been seized was ruled to be inadmissible evidence.

In *Peterson v. State,* 292 A.2d 714, 720, 15 Md.App. 478 (Md.Sp.Ct.App.1972), *Whiteley* was given the following common-sense interpretation:

The immediate holding of Whiteley was that, just as justification for police action is not diminished in transmission, neither is it enhanced. If the justification is adequate at the point where the message is transmitted, it is no less so at the point where the message is received. Conversely, if the justification is inadequate at the point where the message is transmitted, the inadequacy endures and will not somehow be dissipated on the wires or on the airwaves. *In transmission nothing is lost and nothing is gained.* [Emphasis Added].

The majority opinion expressly holds that the initiator of the "BOLO" message, a member of the Austin Police Department, "was without probable cause when the statewide BOLO was issued." (Page 343). In light of this holding, before today, the issue that is before the Court would be simple and easy to resolve. In fact, before the majority erroneously changed the law today, this case could be disposed of by a one sentence opinion, namely: Because the person who initiated the "BOLO" message did not then have probable cause, both appellant's arrest and the subsequent search of his automobile by Riehs were illegal.

However, and notwithstanding its express holding that at the time Riehs arrested appellant he did not have probable

cause, and even in the face of a strong public policy of this State that is against a rule of law which would permit the police to initiate an arrest or search and then justify the arrest or search by information in police hands at the time of the arrest, rather than at the time the directive to arrest or search issued, the majority opinion holds that in assessing the probable cause with which Riehs had to arrest appellant, this Court is not restricted to the state of the information that existed at the time the "BOLO" memorandum issued.

Furthermore, by its holding, the majority implicitly overrules *Colston v. State,* supra, *Colston's* progeny, and all cases which have subscribed to the principle stated in *Colston,* supra.[2] It is amazing to me that the majority is able to accomplish what it does when it does not have the appropriate facts or appropriate law applicable to the facts of the case which would support its holding.

The new rule of law now mandated by the majority opinion is that in "BOLO" cases of the future a court may impute to the arresting officer the collective knowledge or information of all law enforcement personnel who may have participated in the case, provided that the knowledge or information consists of any fact that might tend to go to the crime that was committed. Furthermore, it will not be necessary for the arresting officer to be privy to the knowledge or information that others might have, and the fact that the information or knowledge might have resulted from uncoordinated efforts will be immaterial and irrelevant.

Not only does the new rule of law deprecate the Constitutional rights of all our citizens, it is not in accord with what this Court and the Supreme Court have held in the past.

Furthermore, as far as my research reveals, the doctrine of collective knowledge or information of law enforcement officers, working as an uncoordinated team, has never been invoked and applied to establish probable cause to arrest or search the accused. And the majority does not refer me to a single case, Federal, State, or Timbuktu, which holds this.

In formulating its new rule of law, it is obvious that the majority relies on a footnote that appears in *Whiteley v. Warden,* supra. However, and as Associate Justice Andreen of the California Court of Appeals, Fifth District, further pointed out in *People v. Ford,* see supra, that although the Supreme Court of the United States in *Whiteley v. Warden,* supra, in footnote 12 of the opinion, 401 U.S. 568, 91 S.Ct. 1037, did touch upon the possibility of *the originating officer* securing additional corroborative data after he had issued the directive to stop a defendant, nevertheless, "Thorough research of California and other state and federal cases has failed to reveal any decision which has discussed this footnote in a pertinent manner." (198 Cal.Rptr. at 85–86).

I must add the following at this point. The majority opinion does not cite or refer the reader to anything contrary to what Justice Andreen has stated. Not even anything from Timbuktu!!!

It would be a needless exercise in pedantry to restate the reasons why, except in the most limited of circumstances, a law enforcement official must never arrest or search without warrant. Nevertheless, see *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Heath v. Boyd,* 141 Tex. 569, 175 S.W.2d 214 (1943); *Giacona v. State,* 164 Tex.Cr.R. 325, 298 S.W.2d 587 (1957); *Burton v. State,* 152 Tex.Cr.R. 444, 215 S.W.2d 180 (1948).

---

**2.** After I had finally completed writing this dissenting opinion, and in doing a little "clean-up" in my research, I re-read what various members of this Court stated in their respective opinions filed in *Fry v. State,* 493 S.W.2d 758 (Tex.Cr.App. 1973). I find it rather interesting, because the majority implicitly, if not by its language expressly overrules *Colston v. State,* supra, an opinion authored by Presiding Judge Onion, that it also rejects virtually all of what Judge Odom stated in his original majority opinion and the dissenting opinion on motion for rehearing he wrote in *Fry v. State,* supra.

The majority, however, in formulating its new rule of law, relies upon several Federal decisions as support for its holding that both the warrantless arrest of appellant and the warrantless search of his automobile were permissible under the law. However, a careful reading of those decisions should quickly reveal to anyone that the majority's reliance is misplaced.

Two of its cases are not even factually or legally in point. The facts and holding in *Smith v. United States*, 358 F.2d 833 (D.C. Cir.1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1966), and *Moreno-Vallejo v. United States*, 414 F.2d 901 (5th Cir.1969), are only mirror images of *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

The majority also relies upon *Wood v. Crouse*, 436 F.2d 1077 (10th Cir.1971), cert. denied sub. nom. *Wood v. Gaffney*, 402 U.S. 1010, 91 S.Ct. 2193, 29 L.Ed.2d 432 (1971), a case which Shephard's Citator reflects has never been cited in either a majority or dissenting opinion by any member of this Court, past or present.

However, *Wood v. Crouse*, supra, is factually a little closer to this case than is *Smith* or *Moreno-Vallejo*, supra, in that at least in that case there is a reference to a "BOLO" type message. However, there, contrary to here, no issue concerning probable cause for either the "BOLO" message, the defendant's arrest, or the search of his vehicle was raised. The issue in that cause concerned whether the police had the right to conduct a belated search of the defendant's vehicle. The facts reflect that the arresting officer had received a "BOLO" message for a particularly described vehicle. The "BOLO" message also stated that an occupant of the vehicle had tried to pass a check obtained from a recent burglary of a business establishment. The vehicle that the arresting officer stopped matched in all things the vehicle described in the "BOLO" message. A search of the defendant driver revealed a check that had been taken from the recently burglarized business establishment. The driver and his passenger were taken to the county jail. The vehicle was

left on the highway. Subsequently, two highway patrol officers saw the abandoned vehicle, made contact with the arresting officer, who asked the patrolmen to bring the vehicle to the county jail, which was done. By the opinion, the two highway patrolmen also had received the same "BOLO" message that the arresting officer had received. The arresting officer asked the highway patrolmen to search the defendant's vehicle, which they did at the county jail. Additional checks were found inside the defendant's vehicle by the highway patrolmen. The sole question that was before the panel of the Tenth Circuit was whether the belated search of the vehicle was lawful. Applying *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the panel sustained the search of the vehicle.

In sustaining the search, the panel was careful to point out why it had done so, namely: "The sequence of all the events and the conduct of the officers bring the case within *Chambers* and the justification for the search still obtained when it was made." Thus, because there was probable cause to search the vehicle at the scene where the stop and arrest of the defendant had occurred, it was permissible for the arresting officer to advise other law enforcement officials, the highway patrolmen, to conduct a belated search of the vehicle at the county jail.

As previously noted, the panel opinion in *Wood v. Crouse*, supra, does not reflect that a challenge was made to stopping the defendant's vehicle or to the "BOLO" message as lacking probable cause. Thus, neither the pertinent facts nor the pertinent law stated in *Wood v. Crouse*, supra, which relies upon *Chambers v. Maroney*, supra, are applicable to this cause.

In *Chambers v. Maroney*, supra, the Supreme Court held that if a police officer has probable cause to search a vehicle at the time and place of the arrest, a search of the vehicle at another time and place, even though done several hours after the arrest, did not violate the Fourth Amendment. In sustaining the belated search, the Supreme

Court expressly stated the following: "For constitutional purposes, we see no difference between ... seizing and holding a car before presenting probable cause issues to a magistrate and ... carrying out an immediate search without a warrant."

Thus, in *Wood v. Crouse*, supra, because probable cause to search the defendant's vehicle existed when the initial arrest of the defendant occurred, it was not thereafter necessary to go and obtain a search warrant from a magistrate in order to belatedly search the vehicle. Unquestionably, because the highway patrolmen who searched the defendant's vehicle had received the same "BOLO" message that caused the arresting officer to take the action he did, which message apparently contained sufficient facts to establish probable cause, was an underlying factor which caused the panel of the Tenth Circuit to hold as it did in *Wood v. Crouse*, supra.

Thus, both factually and legally, neither *Wood v. Crouse*, supra, nor *Chambers v. Maroney*, supra, nor its progeny, are applicable to this cause.

The majority asserts that in *Whiteley v. Warden*, supra, the Supreme Court left the clear implication that if *the arresting officer*, although not himself possessed of any factual data tending to corroborate an informer's tip, see *Draper v. United States*, supra, nevertheless, had such corroboration existed, then such could be considered in determining whether probable cause existed. The Supreme Court, however, made no such holding.

However, after reading that portion of *Whiteley v. Warden*, supra, to which the majority opinion refers, it is obvious that what the majority is actually referring to is footnote 12 of the opinion, which states: "The arrest warrant issued at about noon on November 24, 1964 ... State bulletin 881 was broadcast at 3:03 p.m. that same day ... It is apparent that Sheriff Ogburn, [the officer who made the complaint which led to the "BOLO" message being sent], did not himself acquire additional corroborative data possibly supporting a probable-cause arrest after securing the warrant."

Regardless of what clear implication the Supreme Court may have intended when it put footnote 12 in its opinion, the fact remains that no decision of any court, either Federal or State, or even Timbuktu, has ever discussed, much less applied, what the Supreme Court stated in footnote 12. Furthermore, my research has yet to reveal, and the majority does not cite the reader to a single case, where an arrest or search was sustained when all that was shown was an arrest by a law enforcement official who was acting solely pursuant to an insufficient to sustain probable cause "BOLO" message.

The majority also either misreads or misinterprets *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In *Carroll*, supra, although the Supreme Court said much in its opinion regarding the "automobile exception" to the warrant requirement, nevertheless, it only held that if there is known to an officer facts constituting probable cause to believe that a vehicle is carrying contraband or illegal merchandise, then an arrest and a search of the vehicle will be sustained. Or to state the primary holding in another way: If the arresting officer has probable cause to believe that criminally related objects are concealed in an automobile he then has the right to search that automobile. Hence, the warrantless search of the vehicle in *Carroll*, supra, was not unreasonable under the circumstances, because the officers had a probable cause belief, not simply a subjective good faith expectation, which would have been sufficient to justify issuance of a search warrant had their information been laid before a magistrate, even though, in fact, it had not been. Accordingly, the lawful scope for searches under *Carroll*, supra, is determined precisely the same way as the scope of execution of search warrants.

In *Brinegar v. United States*, supra, the Supreme Court sustained a search of an

automobile where it was shown that Federal officers charged with enforcing federal statutes regulating alcoholic beverages were on routine patrol and recognized the driver of an automobile as having been recently involved in illicit liquor transactions, who was then headed toward a well known illegal liquor market. The driver of the vehicle had recently been arrested by one of the officers under the same circumstances. Upon challenge to the existence of probable cause, the Court upheld the validity of the arrest.

From the above, it should be obvious that neither *Carroll* nor *Brinnegar*, supra, are applicable to this cause.

Interestingly, in *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927), which was an almost identical situation as found in *Brinegar*, supra, the Supreme Court held that probable cause was not established because the police officers who had searched the automobile of the defendant without warrant had no knowledge at the time of the arrest and search and seizure that the defendant driver of the vehicle had any background or history of illicit activity, nor were the arresting officers cognizant of the commission of any criminal offense.

Notwithstanding it does not have either the facts or the law to support its holding, the majority nevertheless holds the following:

> ... a minimal showing has been made that the facts and circumstances within the collective knowledge of the officers involved and of which they had reasonably trustworthy information were sufficient to warrant a person of reasonable caution in the belief that appellant had committed an offense and that an instrumentality of the offense might be found in the automobile he drove.

Although I am not yet ready to accept the new rule of law the majority opinion gives birth to, nevertheless, I have diligently searched the opinion for facts, other than appellant's warrantless arrest and the warrantless entry into appellant's automobile by Riehs, that added to the collective order of things. The best that I can determine is that the facts the majority states that Riehs had, which the majority asserts were of a corroborative nature, are those facts which the majority implicitly states that the author of the unanimous original opinion obviously overlooked in holding that Riehs did not have probable cause to arrest appellant or search his automobile.

Those facts are the following: "He [appellant] was found on a road leading from Austin, driving in a direction away from Austin; he had earlier been seen on the same road, traveling in the same direction. Appellant was found, some two hours after the killing, slightly more than ninety miles from the scene of the crime."

I exclaim to the other members of this Court: If what was in the "BOLO" message is added to the above and this is sufficient to constitute probable cause factual data that appellant committed the murder of the decedent in Austin, we might as well rip out of our law the provisions of the Fourth Amendment to the Federal Constitution and Art. I, Section 9, of the Texas Constitution, as well as cease using in our legal vocabulary the phrase "probable cause."

However, before the members of this Court do that, I pray that each will ask himself the following question: If the majority opinion's holding is on such solid legal ground, why is it that it cannot cite a single case, even one from Timbuktu, that would support it both factually and legally?

It is obvious that in its haste to see justice done in this case, what the majority refuses and will not accept is that although Riehs might have had reasonable suspicion, based on the "BOLO" message, to stop and temporarily detain appellant for purposes of investigation, such as to find out what he was doing at that hour of the morning driving his vehicle on a road in a direction away from Austin, approximately ninety miles from the scene of the killing, see *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, he did not take that action. Instead, without

probable cause he arrested appellant and later searched appellant's vehicle. Also see *Armstrong v. State*, 550 S.W.2d 25, 30 (Tex.Cr.App.1976); *Fatemi v. State*, 558 S.W.2d 463 (Tex.Cr.App.1977); and *Leighton v. State*, 544 S.W.2d 394 (Tex.Cr.App. 1976); *Tarpley v. State*, 565 S.W.2d 525 (Tex.Cr.App.1978); *Baldwin v. State*, 606 S.W.2d 872 (Tex.Cr.App.1980).

For all of the above and foregoing reasons, I dissent to the majority holding that at the time Riehs arrested appellant and searched his vehicle he had probable cause to do both.

There is yet a more fundamental reason why appellant's conviction should be set aside, and that is because he was not legally charged with committing a criminal offense. The majority, however, does not choose to write on this subject, content I suppose in having already done sufficient damage to a part of the law of this State.

Even though the majority does not write on the subject, I shall.

Appellant was indicted for violating the provisions of V.T.C.A., Penal Code, Section 22.03(a)(2)(B).

At the time appellant was indicted, Sec. 22.03(a)(2)(B) of the Penal Code provided as follows:

> (a) A person commits [the offense of deadly assault on a court participant] if, with a firearm or a prohibited weapon, he intentionally or knowingly causes serious bodily injury:
>> (2) to a participant in a court proceeding when he knows or has been informed that the person assaulted is a participant in a court proceeding:
>> (B) in retaliation for or on account of the injured person's *having exercised an official power or performed an official duty as a participant in a court proceeding.* [Emphasis Added].

The precursor to the above statute, Art. 488, was originally enacted by the Legislature of this State in 1858. From 1858 until 1979, the applicable statute applied *only* to peace officers. *Payne v. State*, 596 S.W.2d 911, 913 (Tex.Cr.App.1980). However, the Legislature amended the statute in 1979 to include a person who had "performed an *official duty* as a court participant in a court proceeding." [Emphasis Added] The term, *"participant in a court proceeding,"* is defined to mean "a judge, a prosecuting attorney who represents the state, a grand juror, a party in a court proceeding, an attorney representing a party, a witness, or a juror." V.T.C.A., Penal Code, Sec. 1.07(a)(37).

By the formal terms of the statute, when the complaining witness or the victim is other than a peace officer, in order to properly charge a person with committing an offense under the statute, it is necessary that the indictment or information state the following elements:

> (1) A person, (2) with a firearm or a prohibited weapon (2) intentionally or knowingly, (3) causes serious bodily injury, (4) to another person, (5) who is a court participant, (6) and the assaulting party knew or had been informed that the person assaulted was a participant in a court proceeding, (7) and the assault occurred in retaliation for or on account of (8) the injured person's having *performed an official duty as a participant in a court proceeding.* [Emphasis Added].

Omitting the formal parts of the indictment in this cause, it alleges that appellant:

> ... did then and there intentionally and knowingly with a firearm, to-wit: a handgun, cause serious bodily injury to Patricia Dohnalik, a participant in a court proceeding, to-wit: a witness in Cause No. 1–80–28 in the 241st District Court of Smith County, Texas, styled *The State of Texas v. Paul Lanier Woodward, Jr.,* when the said Paul Woodward knew and had been informed that the said Patricia Dohnalik was *a participant in said Court proceding, in retaliation for* and on account of the said Patricia Dohnalik's *having performed an official duty as a participant in said court proceeding, to-wit: having appeared and testified as a witness before the Grand Jury of Smith County, Texas* that returned

the indictment in said Cause No. 1–80–28 in the 241st District Court of Smith County, Texas, and he, the said Paul Woodward, did then and there cause serious bodily injury to the said Patricia Dohnalik, by shooting her with said handgun, thereby causing the death of the said Patricia Dohnalik.

The question this Court should decide is whether the above indictment states a violation of Sec. 22.03(a)(2)(B), i.e., whether a person appearing and testifying before a grand jury is performing an *official duty?* The term "official duty" is not defined in the Penal Code. Therefore, such term must be given its ordinary, common, and familiar meaning. Art. 5429b–2, Sec. 2.01 V.A.C.S.; Art. 3.01, V.A.C.C.P.

À review of the Penal Code reflects that in all instances where the term "official duty" is used, it is used only in the context of performance of a duty by a public servant. The term "public servant" is defined in the Penal Code, see V.T.C.A., Penal Code, Sec. 1.07(a)(30). However, the definition for the term "public servant" limits its meaning to persons performing some governmental function, i.e., a person who is fulfilling duties of office which are public in nature, involving in their performance the exercise of some portion of governmental power falling under either the executive, legislative, or judicial branches of government. Texas Courts in the past have referred to the term "official duties," in reference to the following positions: see, for example, *de la Garza v. State,* 579 S.W.2d 220 (Tex.Cr.App.1979), (a jailer); *Ex parte Spain,* 589 S.W.2d 132 (Tex.Cr.App. 1979), (a district attorney); *Gonzalez v. State,* 574 S.W.2d 135 (Tex.Cr.App.1978), (a constable); *Sutton v. State,* 548 S.W.2d 697 (Tex.Cr.App.1977), (a police officer); *Mutscher v. State,* 514 S.W.2d 905 (Tex.Cr. App.1974), (a legislator); *Dorsey v. State,* 450 S.W.2d 332 (Tex.Cr.App.1969), (a district court judge); *Petro-Chemical Transport, Inc. v. Carroll,* 514 S.W.2d 240 (Tex. 1974), (a clerk of a court of record).

My examination of many of the decisions by courts of this Nation, which have defined, interpreted, or construed the term "public official," see Vol. 35, *Words and Phrases,* under "Public Official," reveals that in every instance where a person has been held to be a "public official," and thus capable of performing official duties, such person was then acting in a governmental capacity, in either the executive, legislative, or judicial branches of government. My research has yet to reveal a single instance where a citizen performing a civic duty, or legal duty if subpoenaed, such as appearing and testifying before a grand jury, has ever been classified as a "public official."

The indictment in this cause alleges that the decedent in this cause had been murdered by the appellant in retaliation because the decedent had performed an official duty, to-wit: she appeared and testified as a witness before a Grand Jury of Smith County, Texas. However, the responsibility of a citizen to testify before a grand jury is not the performance of an official duty, but, instead, is the performance of a civic duty, or a legal duty if subpoenaed.

Thus, because the retaliation that was alleged to have been committed by the appellant was not on account of the performance of an "official duty" by the decedent, the instant indictment does not state a Sec. 22.03(a)(2)(B) offense. See supra.

I must ask: In sum of money, what is the value of this incorporeal hereditament? Is its value the equivalent of an advowson, a tithe, a common, a way, a dignity, a franchise, a pension, an annuity, or a rent? See Vol. VII, *A History of English Law,* by Sir William Holdsworth, at page 317. *Quis Custodiet ipsos custodes?* I am aware of the office of the Lord Chancellor, Vol. I, *A History of English Law,* supra, at page 251; Vol. V, Id., at page 409; the office of Constable, Vol. XIII, Id., at page 447; the office of Justice of the Peace, Vol. XIII, Id., at page 446; the office of high bailiff, Vol. XII, Id., at page 337, and such other "official" offices, but my research has yet to reveal anywhere where English is the native tongue there is such a thing as "office of a witness."

For all of the above and foregoing reasons, I respectfully dissent to the majority affirming the judgment of the Court of Appeals. Appellant's conviction, as a matter of law, should be reversed and not affirmed.