Garces A. ESTRADA aka Charlie Andrades, Appellant,

v.

The STATE of Texas, Appellee.

No. B14–90–00248–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 6, 1992.

Kristine C. Woldy, Houston, for appellant.

Carol M. Cameron, Houston, for appellee.

Before PAUL PRESSLER, JUNELL and ELLIS, JJ.

## OPINION

JUNELL, Justice.

Appellant was convicted by a jury of the felony offense of delivery by offering to sell a controlled substance, namely, cocaine, weighing by aggregate weight, including any adulterants and dilutants, at least 400 grams. He was sentenced by the court to twenty-five years imprisonment and assessed a fine of $10,000.00. We affirm.

Appellant presents five points of error on appeal including the following: (1) that insufficient evidence was introduced to support a finding that the appellant was guilty of delivery by offering to sell; (2) that insufficient evidence was presented to support a special issue to the jury on the use and/or exhibition of a deadly weapon by the appellant; (3) that probable cause was lacking for the arrest or search of appellant at the time the weapon was found and that the trial court erred in submitting a special issue on use or exhibition of a deadly weapon; (4) that the trial court erred in overruling appellant's motion for mistrial which was based on the prosecutor's sidebar comment; and (5) that the trial court erred in overruling the appellant's objection to the state's attack of appellant over the shoulders of counsel.

This story begins on the morning of May 25, 1989 when a confidential informant contacted Detective Albert Ray Diaz of the Harris County Sheriff's Department, Narcotics Division. The informant tipped Detective Diaz regarding potential suppliers of ten to fifteen kilos of cocaine, and agreed to set up a meeting between the Detective and the drug dealers. This offer

to deliver cocaine occurred during four different meetings and involved a group of five different people.

The first meeting took place at 11:30 a.m. on May 25, 1989 at the Dairy Queen on Airline. Detectives Diaz and John Schulte, both of the Sheriff's department, the informant, and Jairo Manual Vivanco were present at the meeting. Detective Diaz informed Vivanco that he was interested in purchasing eight kilos of cocaine. Vivanco assured the detective that he could provide all eight kilos at a wholesale price of $17,000.00 per kilo for a total of $136,000.00. Vivanco asked to see the money and Detective Diaz took him to the truck were Detective Schulte was waiting. Vivanco saw the money and then explained that he needed to speak with his contact about arranging the delivery. Vivanco told Diaz that he would call as soon as he spoke with his connection. Vivanco left the Dairy Queen and entered an apartment at 11555 Airline. At 1:10 p.m. Vivanco beeped Det. Diaz and told him that his connection was coming to his apartment.

A second meeting occurred at 1:30 p.m. at the Dairy Queen. Vivanco left the apartment complex for the meeting in a blue Cutlass. Jimmy Rodriguez and Johnny Rodriguez were also riding in the Cutlass. The blue Cutlass was driven to the Dairy Queen parking lot and waited for the detectives to arrive. Detective Schulte parked his truck in the Jack in the Box lot next to the Dairy Queen. Det. Diaz walked to the Cutlass and was introduced by Vivanco to Jimmy and Johnny Rodriguez. Vivanco said that Jimmy had a supplier, but Jimmy wanted to see the money first. After looking at the money, Jimmy Rodriguez said that he would call his connection immediately; and he then proceeded to a pay phone near the Dairy Queen. He made a phone call. Jimmy then explained to Diaz that the cocaine would not be available until around 5:00 p.m. when his contact got off work. Jimmy agreed to beep Diaz when the cocaine arrived in the area. Jimmy, Johnny and Vivanco got back in the Cutlass and drove to the apartment at 11555 Airline.

After the telephone call was made, the appellant and Overt Alegria arrived at the Airline apartment in a red Subaru. Vivanco beeped Det. Diaz after 5:00 p.m. to let him know that Vivanco would beep Diaz as soon as the cocaine arrived. Surveillance was maintained on the apartment at Airline. The appellant, Vivanco, Jimmy, Johnny, and Alegria were seen carrying clothes out of the apartment. After loading the clothes into the two cars, Vivanco, and the Rodriguezes drove off in the Cutlass, and appellant and Alegria left in the red Subaru. The appellant and Alegria stopped at a dumpster near the apartment and Alegria pulled a gray duffel bag out of the dumpster. The duffel bag was similar to the one which was found in the blue Cutlass when appellant and the other four persons were arrested. Alegria put the duffel bag in the Subaru and they drove off.

Vivanco paged the detectives again and informed them that the cocaine had arrived. They arranged for a third meeting at the Dairy Queen at 6:00 p.m. The drug transfer was scheduled to take place at an apartment complex located at Denmar and Imperial Valley. The detectives followed the group in the blue Cutlass. The red Subaru was seen circling the complex before the Cutlass arrived. The Subaru was then parked at an office complex across the street from the Denmar/Imperial Valley apartments. Alegria and the appellant walked from the Subaru to the apartment complex. Alegria walked in and out of the breezeway at the apartment and looked all around until appellant picked him up in the Subaru. The Subaru was then followed from the Denmar/Imperial Valley apartment complex to the apartment on Airline. The Subaru was seen entering the parking lot, and it was parked near the entrance to Vivanco's apartment.

Back at the apartment complex on Imperial Valley, Vivanco showed Detective Diaz a bag which was similar to the one found in the Cutlass when all five persons were arrested. The bag contained several blocks wrapped in gray duct-tape. Vivanco gave Det. Diaz a small sample in a little bag to test. The detective asked to test the packages wrapped in duct tape, but Vivanco

refused. Vivanco gave the order to leave and he and the two Rodriguezes drove away in the Cutlass. They returned to the Airline apartment complex and parked next to the Subaru. Contact between the parties was reestablished at about 10:00 p.m. when Vivanco beeped Diaz. They agreed to talk again the next morning at 11:00 a.m.

The fourth and final meeting was scheduled to occur on the morning of May 26, 1989 at the Safeway store on Airline. Detective Diaz demanded that he be allowed to cut into the packages to sample the cocaine. Surveillance of the Airline apartment continued on the morning of May 26th. That morning the red Subaru was parked at the apartment complex two cars down from the Cutlass. The appellant and Alegria were seen exiting the Airline apartment with Vivanco's group. The appellant and Alegria drove off in the Subaru and the others drove off in the Cutlass. At about 11:30 a.m. appellant parked the red Subaru in the parking lot north of the Safeway on Airline. Vivanco parked the Cutlass in the Safeway lot next to Detective Diaz's Lebaron. Detective Schulte parked his truck twenty five yards away.

The appellant and Alegria opened the trunk of the Subaru and changed shirts. Then they drove the Subaru into the Safeway parking lot and parked near the Cutlass. The appellant went first to the street side of the parking lot and then walked through the parking lot past Det. Schulte's truck. Alegria went to the front of the Safeway store and stood around looking out over the parking lot. One of the detectives notified everyone that appellant was walking towards the detective's truck and that Alegria was at the front of the store. Det. Schulte moved his truck to the other side of the lot, but the appellant continued to walk towards it.

Meanwhile, the drug sale was in progress on the other side of the parking lot. Det. Diaz asked to see the merchandise and to test it, but Vivanco wanted to see the money first. Diaz insisted on testing the packages. Vivanco cut into the bundles and gave the detective a sample.

Detective Diaz told Vivanco he was going to the car for the money. He then gave the bust signal. Detectives Diaz and Schulte left the scene in the truck. Detective Stan Crane, part-time reserve detective of the Sheriff's Department, arrested the appellant. During the arrest the officer found a loaded revolver. Det. J.W. Pruitt arrested the three people in the cutlass including Vivanco. He recovered a loaded pistol from Vivanco's pocket and a loaded pistol from the floorboard of the Cutlass in front of Johnny Rodriguez. A gray duffel bag was also recovered from the Cutlass. The bag contained the gray duct-tape packages. The examination of the packages revealed that six of the eight packages contained a bottle cap filled with cocaine.

█ In addressing the appellant's first point of error, we must examine the evidence in the light most favorable to the verdict. The standard of review of the jury verdict is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455 (Tex. Crim.App.1984). If the conclusion of the guilt of the defendant can be drawn from the combined and cumulative force of all the incriminating circumstances, a rational trier of fact could have found guilt. *Russell v. State*, 665 S.W.2d 771, 776 (Tex. Crim.App.1983). A rational jury could have found based on all of the evidence set out above that the appellant was a party to the delivery by offering to sell. Under the law of parties, a person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX.PENAL CODE ANN. § 7.02(a)(2) (Vernon 1974). A review of the evidence needs to show merely that the actor was present at the commission of the offense and encouraged the commission of the offense either by words or other agreement. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). In making the determination whether a defendant participated in an of-

fense as a party, the court may examine the events occurring before, during and after the commission of the offense. *Burdine,* supra. Based on the totality of the circumstances involved in this transaction and the appellant's constant presence and closeness with the entire drug sale, a rational jury could have found beyond a reasonable doubt all of the essential elements of delivery by offering to sell a controlled substance and that appellant was guilty as a party to the offense. Appellant's first point of error is overruled.

■ Appellant's next two points of error can be dealt with together. Appellant asserts in his second point of error that the trial court erred in submitting a special issue to the jury on the use and exhibition of a deadly weapon because there was no evidence to support the instruction. The third point asserts that the trial court erred in submitting the deadly weapon issue to the jury because there was no probable cause for the appellant's arrest and search incident to arrest. We overrule these points of error.

In *Patterson v. State,* 769 S.W.2d 938 (Tex.Crim.App.1989), the court of criminal appeals, affirmed the court of appeal's construction of Art. 4476–15, sec. 4.02(b)(6), and sec. 4.04(b), V.A.T.S. (Vernon 1976). The court of criminal appeals affirmed the holding by saying, "Therefore, the court of appeals was correct when it stated that 'used ... during the commission of a felony offense' refers certainly to the wielding of a firearm with effect, but it extends as well to any employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony.... Thus, one can 'use' a deadly weapon without exhibiting it, but it is doubtful one can exhibit a deadly weapon during the commission of a felony without using it." The facts in this case are somewhat different from *Patterson.* In *Patterson,* defendant was in possession of the contraband, whereas in this case the appellant was convicted under the law of parties of delivery by offering to sell. The holding in *Patterson* is still applicable to these facts. Appellant actually possessed the weapon and the effect of this possession was to facilitate the felony of delivery by offering to sell. The mere fact that the appellant was not in possession of the contraband is irrelevant here.

The court of criminal appeals has held that all that must be shown to establish use of a deadly weapon is simple possession that facilitates the felony. The evidence in this case was sufficient to permit a special issue on the use of a deadly weapon. The state proved that the appellant was carrying a firearm at the time the felony was occurring. There was no error in submitting this issue.

■ Appellant's third point of error regarding the lack of probable cause for his arrest and search incident to arrest has no merit. The test to determine whether a particular set of circumstances rise to the level of suspicious circumstances is:

Whether at that moment the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense. *Adkins v. State,* 764 S.W.2d 782, 785 (Tex.Crim. App.1988).

The appellant and the other four persons had been under surveillance for two days at or near the vicinity of the drug sale meetings. He was seen in the same apartment with Vivanco and the Rodriguezes, who were directly involved in the offer to sell. On the day of his arrest appellant parked in the same parking lot where the meeting was to take place. He walked toward Detective Schulte's truck where the cash was located, and even changed directions to follow the truck when the detective moved it. When there are several officers who have been working on a case, the sum of the information known to the cooperating agencies or officers at the time of an arrest is to be considered in determining whether there was sufficient probable cause. *Woodward v. State,* 668 S.W.2d 337, 344 (Tex.Crim.App.1984). All of these facts taken together are sufficient to support a finding that the officers had proba-

ble cause to arrest appellant. Detective Crane also had sufficient probable cause to arrest the appellant under TEX.CODE CRIM. PROC.ANN. art. 14.04 (Vernon 1977), and TEX.CODE CRIM.PROC.ANN. art. 14.03(a)(1) (Vernon Supp.1991). Thus there was probable cause for the warrantless arrest, and the search of the appellant was incident to a lawful arrest. *Williams v. State,* 726 S.W.2d 99, 100, 101 (Tex.Crim.App.1986).

 The appellant's fourth point of error deals with the trial court's failure to declare a mistrial based on the prosecutor's sidebar remark. The appellant properly objected to the prosecutor's remark and was sustained by the trial court. The appellant then requested the trial court instruct the jury to disregard the comment, which was done. Appellant then moved for a mistrial which was denied by the trial court. It is from this denial that the appellant complains. We overrule appellant's fourth point of error on the ground that the trial court's instruction to disregard cured any error, and the denial of the motion for mistrial was not error. *Bell v. State,* 724 S.W.2d 780, 803 (Tex.Crim.App. 1986) *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).

Appellant's fifth point of error focuses on the closing argument made by the state. The prosecutor referred to the offense report which they offered into evidence and which the court refused to admit. The prosecutor commented on the defense counsels' objection to the offer during closing argument. Appellant objected to this as improper argument, and the trial court overruled the objection. The court of criminal appeals has defined the boundaries for proper argument as including: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answers to the arguments of opposing counsel; and (4) pleas for law enforcement. *Alejandro v. State,* 493 S.W.2d 230 (Tex. Crim.App.1973). This argument does not fit into any one of these three categories, but it is unclear whether it was error for the trial court to overrule the appellant's objection. If it was error, it was harmless error. In the harmless error analysis the appellate court is to calculate as much as possible the probable impact of the error on the jury in light of other evidence. TEX. R.APP.P. 81(b)(2); *Harris v. State,* 790 S.W.2d 568, 586 (Tex.Crim.App.1989). If overwhelming evidence dissipates the error's effect upon the jury's functioning in determining facts so that it does not contribute to the verdict, then the error is harmless; otherwise it is not. *Harris,* 790 S.W.2d at 587. If it was error for the trial court to overrule the objection by the appellant, the overwhelming evidence dissipated the error's effect upon the jury's functioning and did not contribute to the verdict. The fifth point of error is overruled.

The judgment of the trial court is affirmed.