# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00203-CR

**Joshua Dwayne Davis, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
NO. B-11-0277-SB, HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Joshua Dwayne Davis of the offense of possession of a controlled substance, cocaine, with intent to deliver. *See* Tex. Health & Safety Code § 481.102(3)(D), .112(c). Punishment was assessed at 25 years' imprisonment. In six issues on appeal, Davis asserts that the district court abused its discretion in denying his motion to suppress on various grounds, that the jury improperly considered the evidence that Davis sought to have suppressed, and that the evidence is insufficient to support his conviction. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that, on February 2, 2011, a confidential informant alerted the San Angelo Police Department that a person later identified as Davis was involved in narcotics trafficking. The evidence, which we discuss in more detail below as it is relevant to Davis's issues

on appeal, tended to show that officers proceeded to follow Davis's vehicle around San Angelo and—after observing Davis engage in several of what they believed to be drug transactions, including two at a motel in San Angelo that was known for narcotics activity—initiated a traffic stop on the vehicle. Following the stop, officers arrested Davis and discovered crack cocaine and other contraband in Davis's vehicle and on his person, and Davis was later charged with possession of a controlled substance with intent to deliver. Prior to trial, Davis filed a motion to suppress, asserting that the traffic stop and arrest were illegal. Following a hearing, the district court denied the motion to suppress, finding that the stop was justified either by the officers' reasonable suspicion to believe that a traffic offense had been committed or by the officers' probable cause to arrest Davis for narcotics activity. The district court also found in the alternative that the officers had probable cause to arrest Davis for driving with a suspended license, an offense that the officers had discovered at some point following the traffic stop. The case proceeded to trial. The jury found Davis guilty as charged and assessed punishment as noted above. The district court sentenced Davis in accordance with the jury's verdict. This appeal followed.

## ANALYSIS

**Motion to suppress**

Davis's first four issues challenge the district court's denial of Davis's motion to suppress evidence and the jury's subsequent consideration of the evidence that Davis sought to suppress. In his first issue, Davis asserts that the district court abused its discretion in finding that the arresting officers had reasonable suspicion to stop his vehicle for committing a traffic offense. In his second issue, Davis asserts that the district court abused its discretion in finding that the

2

officers had probable cause at the time of the traffic stop to arrest Davis for narcotics activity. In his third issue, Davis asserts in the alternative that the district court abused its discretion in finding that the officers had probable cause following the stop to arrest him for the offense of driving with a suspended license. And, in his fourth issue, Davis asserts that the jury improperly considered the evidence obtained following the traffic stop that Davis contends should have been suppressed.[1]

"In review of a trial court's ruling on a motion to suppress, an appellate court must apply a standard of abuse of discretion and overturn the trial court's ruling only if it is outside the zone of reasonable disagreement." *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). We are to apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 87-89 (Tex. Crim. App. 1997)). When reviewing a trial court's ruling on a motion to suppress, we view the evidence in the light most favorable to the ruling. *State v. Robinson*, 334 S.W.3d 776, 778 (Tex. Crim. App. 2011) (citing *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006)). If the trial court makes findings of fact, as it did here, we determine whether the evidence supports those findings. *Id.* We then review the trial court's legal rulings de novo unless the findings are dispositive. *Id.* "We will sustain the trial court's ruling if that ruling is 'reasonably supported by the record and is correct on any

---

[1] Davis provides no additional analysis in his fourth issue, which appears to rely entirely on the premise that the evidence was illegally obtained for the reasons explained in Davis's first three issues.

3

theory of law applicable to the case.'" *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) (quoting *Dixon*, 206 S.W.3d at 590).

At the suppression hearing and at trial,[2] the district court heard evidence that, on February 2, 2011, officers with the San Angelo Police Department were investigating suspected drug trafficking. Detective Hank Hethcock of the Narcotics Division testified that, on that date, he had received information over the telephone from a confidential informant. According to Hethcock, this informant had provided accurate information regarding drug transactions "well over 20 times." The informant, who had initiated the contact with Hethcock, told him "that he had seen an individual he knew as 'J' in a Mustang up in the northern part of San Angelo." In court, Hethcock identified Davis as the individual known as "J." Hethcock explained, "The confidential informant contacted me via telephone and told me that he had seen Mr. Davis in possession of crack cocaine, told me what vehicle he would be in, and gave an area of where we could possibly locate it." Hethcock added that the informant described the vehicle as a "gray Ford Mustang" and indicated that Davis was the driver of the vehicle. The informant also told Hethcock that Davis had a partner in the vehicle, identified only as "Brad."

Hethcock then "contacted other members of the division, and [they] went out in search of the vehicle." Hethcock eventually located the vehicle "in the northern part of San Angelo"

---

[2] In reviewing a trial court's ruling on a motion to suppress, "we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later." *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). "However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually re-litigated by the parties during trial on the merits." *Id.* "Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review." *Id.*

but observed that "it was just occupied by the Defendant." The informant, who had called Hethcock "throughout the incident," told Hethcock that "Brad was no longer with 'J'" and that Brad was "at the room cutting [the crack cocaine] up, or chopping it up." According to Hethcock, the informant told him that Davis's role that day was to be "involved in the distribution of crack cocaine."

Hethcock continued monitoring the vehicle's activity, either personally or with the assistance of other officers. He explained,

> I maintained surveillance on it, let the other members of my team know the location, and then we all set up to surve[y] the vehicle to see where it was going and what they were doing, and at that time I also contacted members of our Special Operations Section, who have marked units, to where we could take down the vehicle when we needed to.
>
> . . . .
>
> I personally didn't observe some of [the vehicle's activity] because, for the most part, I had the eyes, so as not to burn our vehicles, or let the people know what we are doing, we stop following them for brief periods of time to, so-to-speak, let your vehicle cool off and stay out of the area while the other units pick up the surveillance, and while that was going on, I was being told by my team members what was happening.

Hethcock testified that, throughout the surveillance, the vehicle was observed making brief stops at "several locations," which Hethcock described as "minute traffic" that, he believed, was "consistent with . . . illegal narcotic activity." When asked to explain what he meant by "minute traffic," Hetchock explained,

> Just different locations. From what I have learned, people don't like to conduct business at their house, for fear of detection by law enforcement, so they will meet people at different places, or go and deliver it to them. The sole purpose is for an illegal narcotic transaction. They will pull up, meet somewhere, either get out, or

5

someone will get in their car, and the whole thing takes maybe, you know, a minute to two minutes, sometimes a little longer or shorter.

Hethcock also agreed with the prosecutor's description of the transactions as "brief encounters at parking lots, convenience stores, things of that nature." Although Hethcock did not personally observe any of these transactions, he testified that other officers did.

Hethcock further testified that the vehicle was eventually found at the El Patio Motel in San Angelo, which, according to Hethcock, had a reputation in the community for being a location of narcotics trafficking and other crimes. Hethcock explained, "It's more than just narcotics. It's just a, I hate to use the word cess pool, of illegal activity that takes place there, as far as there is stolen property, prostitution, narcotics, wanted people are there. It's just that most of the bad individuals hang out there and rent rooms." By the time Hethcock arrived at the motel, he observed Davis's vehicle parked on the northeast side of the motel and saw Davis come out of one of the rooms in a different building on the south side of the motel, get back into the vehicle, and drive away. According to Hethcock, it was after 5:00 p.m. when he saw Davis exit the room, and, because it was early February, it was beginning to get dark outside. Hethcock also testified that the weather was "freezing" at the time and that there was snow and ice on the ground.

After Davis had left, Hethcock remained at the motel and continued to conduct surveillance on the room from where Davis had been seen, believing it to be the room where "Brad" and the majority of the narcotics were located. Later that night, Davis returned to the motel, driving the same vehicle. According to Hethcock, Davis "parked in the same spot, across in a different building, and then exited the vehicle and went to Room 146, knocked on the door, and then someone looked out and then allowed him entrance into the room." Hethcock added that Davis "left pretty

6

quickly" and again drove away. This time, Hethcock testified, he had a marked unit follow Davis and instructed the officers to stop the vehicle.

One of the officers who had initiated the traffic stop was Detective Craig Thomason of the San Angelo Police Department Special Operations Unit, which was assisting the Narcotics Division on the date in question. Thomason was aware that the suspect vehicle had been at the El Patio Motel and that the driver was suspected of "trafficking narcotics throughout the San Angelo area." Thomason testified that, as he was following the vehicle, he observed that the vehicle had an "obscured license plate," which he believed was a traffic violation. Thomason explained that he thought the license plate was "covered with a tint-like material" and that the plate was "unreadable" at approximately forty feet away. According to Thomason, it was "completely dark" outside, and "a snow storm had recently come to town. . . . Snow is on the ground, ice, a lot of slush, muddy slush, for lack of better words." Thomason testified that his partner, Detective Chris Chappa, agreed with his assessment of the license plate being obscured. Based on this observation, Thomason and Chappa initiated the traffic stop.[3]

After stopping the vehicle, Thomason approached the driver side of the vehicle while Chappa approached the passenger side. Upon approaching the window, which was open at the time, Thomason "detected the strong odor of marihuana emitting from inside that vehicle." Thomason then told Davis to exit the vehicle and placed him in handcuffs. Thomason summarized

---

[3] Photographs of the vehicle's license plate, taken after the traffic stop, were admitted into evidence. In the photographs, the first three letters of the license-plate number do appear to be somewhat obscured, particularly from a distance. However, Thomason acknowledged that the photographs do not necessarily represent an accurate representation of the license plate as it appeared to the officers as they were following the vehicle, as the reflection from the camera flash might have distorted the image.

the sequence of events as follows: "I saw the [traffic] violation. I went up to the vehicle. Immediately when I made contact with Mr. Davis, I smelled the odor of marihuana emitting from that vehicle. Therefore, he was taken from the vehicle and placed in handcuffs for my safety and for the preservation of evidence. That's how it went down." Thomason testified that, at some point after they had Davis exit the vehicle, they discovered that Davis was driving with a suspended license, and arrested him for committing that offense. Also, having now smelled marihuana inside the vehicle, Thomason and Chappa proceeded to search the vehicle for contraband. In the center console of the vehicle, the officers discovered what they believed to be a controlled substance, which was later determined to be cocaine, and a digital scale. A large amount of cash was also found on Davis's person, specifically $1,980.00. Additionally, upon closer inspection of the vehicle, Thomason discovered that the license plate was obscured by what appeared to be road grime, not a "tint-like material" as he had originally believed.

Davis, who was now under arrest for both driving with a suspended license and possession of a controlled substance, was subsequently transported to the Tom Green County Jail. Once there, Davis was strip-searched for booking purposes. During the search, Thomason observed what appeared to be "a clear plastic baggy right next to his anus," which the jailer who was searching Davis removed and handed to Thomason. According to Thomason, the baggy "held an off-white rock-like substance, which, from [his] training and experience, [he] recognized to be crack cocaine."

Based on the above evidence, the district court denied Davis's motion to suppress, and made the following findings of fact and conclusions of law on the record:

8

Detective Hethcock, a San Angelo narcotics officer, received information from a confidential informant that the Defendant, known as "J," would be in possession of crack cocaine, that he would be in a grey Mustang in north San Angelo.

He testified that the confidential informant had given him correct information on 20 other occasions approximately. He initially located the Defendant in the gray Mustang at about 5:00 in the evening. He received continuing calls from the confidential informant, which, when consulting with other officers doing the surveillance, proved to be correct, such as making minute traffic stops, drugs stops, going to El Patio, where Brad, the partner, was supposedly cutting up crack cocaine. He was observed going into the El Patio Motel on two occasions for very brief periods of time.

This Court, from four years of being a prosecutor in Tom Green County and eighteen years as being a defense attorney in Tom Green County, will take judicial notice that the El Patio Motel is exactly the way Detective Hethcock described it. If you want to find something wrong going on in San Angelo, it's going to be down at the El Patio Motel, I can assure you. So I have to take that into account, too, that area of town where the Defendant was located going into the motel and out of the motel very briefly.

The Court finds that a stop was made by Officers Thomason and Chappa. They made a stop for an obscured license plate. The Court finds that Section 502.409(a)(7) of the Texas Transportation Code applies. If it has a coating, covering, or protective material that distorts angular visibility or detectability, or alters or obscures the letters or numbers on the plate, the color of the plate, or other original design. It doesn't have to be road grime, but road grime can be a coating or covering.

The statute further does not say the degree of how much that coating or covering must be opaque, as long as it obscures. The officer testified that, from his distance, without seeing it through a camera flash, that it was obscured. He then, at some point in time, his report is unclear of, after stopping the vehicle, discovered that it was not a tinted coating on there, but road grime, he testified.

The Court also remembers that February 2nd was a very snowy day, one of those perfect storm days that we very rarely have in San Angelo.

The Court concludes that the officer had a basis for stopping the vehicle. A traffic stop is a seizure within the meaning of the 4th Amendment.

In the present case, the traffic violation took place in the officer's view and he had sufficient authority to stop the vehicle.

9

The Court further finds that even though the Defendant was handcuffed, that this still does not mean that the officer did not have a basis for detaining the Defendant for a brief period of time and handcuffing him for his own safety.

The Court further finds that there was probable cause based upon the confidential informant's statement, statements, plural, to Detective Hethcock.

And, lastly, the Defendant could have been arrested for driving while license was suspended, and that due to the mobility of the vehicle, the vehicle could have been searched incident to arrest at that point in time for inventory, which would have resulted in the same position we are in at this point in time, so based on all those reasons, the Court is denying the Motion to Suppress and we will proceed.

The district court made the same ruling (without re-stating its earlier findings) when Davis re-urged his motion to suppress during trial.

Again, we must affirm the district court's ruling if it is "reasonably supported by the record" and not "outside the zone of reasonable disagreement." *See Martinez*, 348 S.W.3d at 922; *Valtierra*, 310 S.W.3d at 448. Additionally, because the district court found the traffic stop valid under both a theory of reasonable suspicion to believe that a traffic offense had been committed and a theory of probable cause to believe that a narcotics offense had been committed, we must sustain the ruling if it is correct under either theory. *See Valtierra*, 310 S.W.3d at 448. For the following reasons, we conclude that the ruling can be sustained on the theory that, at the time of the traffic stop, the officers had probable cause to arrest Davis for committing a narcotics offense.

"An arrest occurs when a person's liberty of movement is restricted or restrained."[4] *Amores v. State*, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991). A person may be arrested without

---

[4] In this case, it is undisputed that Davis was arrested rather than detained during the traffic stop, and this conclusion is supported by the record. The evidence tends to show that Davis was told to exit the vehicle as soon as the officers contacted him and was immediately placed in handcuffs.

a warrant only upon a showing of probable cause. *Id.* "Probable cause exists where the police have reasonably trustworthy information, considered as a whole, sufficient to warrant a reasonable person to believe a particular person has committed or is committing an offense." *Hughes v. State*, 24 S.W.3d 833, 838 (Tex. Crim. App. 2000). "The determination of the existence of probable cause concerns 'the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence." *Id.* "The rule of probable cause seeks to accommodate the sometimes opposing interests of safeguarding citizens from rash and unreasonable police conduct and giving fair leeway to legitimate law enforcement efforts." *Id.* (citing *Woodward v. State*, 668 S.W.2d 337, 345-46 (Tex. Crim. App. 1984) (op. on reh'g)).

Probable-cause determinations are both made and reviewed by considering the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Guzman*, 955 S.W.2d at 87-88; *Amores*, 816 S.W.2d at 413. Accordingly, it is improper to examine each fact independently and determine whether each fact standing alone would be sufficient to support a finding of probable cause. *See Guzman*, 955 S.W.2d at 87. Rather, we are to determine "whether the facts, when taken as a whole, were sufficient to give the officers probable cause to arrest appellant." *Id.* Under the totality-of-the-circumstances approach, tips provided by a confidential informant are to be considered, and the informant's veracity, reliability, and basis of knowledge are all relevant factors in determining the value of a tip. *See Gates*, 462 U.S. at 230; *Dixon v. State*, 206 S.W.3d 613, 616

11

(Tex. Crim. App. 2006). Additionally, "[i]t is well established that an officer who does not himself possess probable cause for making a warrantless arrest may act upon the basis of information relayed to him by another officer requesting that an arrest be made." *Pyles v. State*, 755 S.W.2d 98, 109 (Tex. Crim. App. 1988); *Tarpley v. State*, 565 S.W.2d 525, 529 (Tex. Crim. App. 1978). "Where several officers are involved, the sum of the information known to the cooperating officers at the time of arrest is to be considered in determining probable cause." *Garrison v. State*, 726 S.W.2d 134, 137 (Tex. Crim. App. 1987) (citing *Woodward*, 668 S.W.2d at 334).

Here, the totality of the circumstances include the following: (1) a confidential informant called Detective Hethcock and told him that he had seen an individual known as "J" in possession of crack cocaine; (2) the informant told Hethcock that "J" was driving a gray Ford Mustang in the northern part of San Angelo; (3) the informant had provided accurate information regarding drug transactions "well over 20 times"; (4) Hethcock located the vehicle described by the informant in the area of town where the informant had indicated the vehicle would be found; (5) the informant also told Hethcock that, at one point, Davis had a passenger in the vehicle known as "Brad"; (6) the informant, who had called Hethcock "throughout the incident," told Hethcock that "Brad was no longer with 'J'" and that "Brad" was now in a room, "cutting [the crack cocaine] up, or chopping it up"; (7) the informant told Hethcock that Davis's role that day was to "distribut[e] the crack cocaine"; (8) other officers working with Hethcock observed the vehicle make brief stops at "several locations," which Hethcock characterized as "minute traffic" that was consistent with illegal narcotic activity; (9) "minute traffic" was further described as "brief encounters at parking lots, convenience stores, things of that nature" for the purpose of conducting "illegal narcotics transactions"; (10) Hethcock located Davis's vehicle at the El Patio Motel, which

12

Hethcock described as "a cess pool of illegal activity," including narcotics trafficking; (11) Hethcock observed Davis coming out of a room at the motel, walking across the street to his vehicle, and then driving away; (12) later that evening, Hethcock saw Davis return to the motel, park in the same location as earlier, and go to the same room; (13) Hethcock also saw Davis knock on the door, someone look out the door, and that person allow Davis entry into the room; (14) Hethcock observed Davis leave the room "pretty quickly" and again drive away. Viewing the above circumstances in their totality, we conclude that the record supports a finding by the district court that the police had reasonably trustworthy information that, when considered as a whole, is sufficient to warrant a reasonable person to believe that Davis had committed or was committing a narcotics offense. *See Woodward*, 668 S.W.2d at 344-46; *McNickles v. State*, 230 S.W.3d 816, 819-21 (Tex. App.—Houston [14th Dist.] 2007, no pet.). To summarize, a confidential informant, who had provided accurate information regarding drug transactions "well over 20 times," had informed Hethcock that Davis was in possession of and distributing crack cocaine, and accurately identified both the vehicle and the general location in which Davis would be found doing so; other officers observed Davis's vehicle make "brief stops" at "several locations" throughout town in a manner that was consistent with illegal narcotics transactions; and Hethcock personally observed Davis on two occasions in the same evening exit a room at a motel known as a "cess pool of illegal activity," including narcotics trafficking, where Davis's partner was believed to be located, "cutting [the crack cocaine] up, or chopping it up." The determination that the officers had, at the time of the traffic stop, probable cause to arrest Davis for committing a narcotics offense is "reasonably supported by the record" and is not "outside the zone of reasonable disagreement." Accordingly,

13

we cannot conclude that the district court abused its discretion in denying the motion to suppress on that ground.

Because we can sustain the district court's denial of the motion to suppress on the above ground, we need not consider the alternate grounds on which the district court denied the motion to suppress. And, because we cannot conclude that the district court abused its discretion in denying the motion to suppress, we similarly cannot conclude that the evidence was improperly considered by the jury. We overrule Davis's first, second, third, and fourth issues.

**Evidentiary sufficiency**

In his fifth issue, Davis asserts that the evidence is insufficient to prove that he possessed the cocaine found in the vehicle he was driving. In his sixth issue, Davis asserts that the evidence is insufficient to prove that he had an intent to deliver the cocaine.

When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the finding of guilt to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virgina*, 443 U.S. 307, 319 (1979). We must consider all the evidence in the record, whether direct or circumstantial or properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the finding, and we defer to the trier of fact's determinations of the witnesses' credibility and the weight to be given their testimony. *Jackson*, 443 U.S. at 318; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04.

14

We first address the sufficiency of the evidence tending to show that Davis possessed the cocaine. To prove that Davis possessed the cocaine, the State was required to prove that Davis: (1) exercised control, management, or care over the contraband; and (2) knew that the item he possessed was contraband. *See Blackman v. State*, 350 S.W.3d 588, 594 (Tex. Crim. App. 2011) (citing *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005)). "Whether this evidence is direct or circumstantial, 'it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. This is the whole of the so-called 'affirmative links' rule.'" *Poindexter*, 153 S.W.3d at 405-06 (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)).

There are many factors by which a defendant may, under the unique circumstances of each case, be sufficiently "linked" to the contraband, including: (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the contraband; (4) whether the defendant was under the influence of contraband when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made incriminating statements when arrested; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether the place where the drugs were found was enclosed; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt. *Id*. at 745. However, "[t]hese are simply some factors which may circumstantially establish the legal sufficiency of the evidence to prove a knowing 'possession.'

15

They are not a litmus test." *Id*. Furthermore, it is not the number of links that is dispositive, but rather the logical force of all the evidence, direct and circumstantial. *Id*. at 745. The force of these links need not be such as to exclude every other alternative hypothesis except the defendant's guilt. *Brown*, 911 S.W.2d at 748; *Figueroa v. State*, 250 S.W.3d 490, 501 (Tex. App.—Austin 2008, pet. ref'd).

In this case, the evidence tending to "link" Davis to the cocaine found in the vehicle includes the following: (1) Davis was the driver of and the only occupant in the vehicle at the time the cocaine was found; (2) the cocaine was found in the console of the vehicle, to which, the jury could have reasonably inferred, Davis had easy access; (3) Davis was found with a large amount of cash on his person at the time the cocaine was found, approximately $2,000; (4) Detective Thomason testified that he smelled an odor of marihuana when he approached the vehicle, which, the jury could have reasonably inferred, indicated that Davis had possessed other contraband; (5) an additional amount of cocaine was subsequently found on Davis's person, which, the jury could have reasonably inferred, indicated that Davis was aware of the cocaine in the vehicle; (6) the confidential informant had told Detective Hethcock that Davis was in possession of cocaine; (7) a digital scale was also found in the vehicle; (8) based on the smell of marihuana in the vehicle, the jury could have reasonably inferred that Davis was under the influence of narcotics; (9) prior to the traffic stop, Davis was seen exiting a room at the El Patio Motel, which, Hethcock testified, had a reputation for criminal activity including narcotics trafficking; and (10) the cocaine was found in a clear plastic baggy, which, the jury could have reasonably inferred, would have been easily visible to Davis. Viewing the above evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Davis:

16

(1) exercised control, management, or care over the cocaine; and (2) knew that the item he possessed was cocaine. Accordingly, the evidence is sufficient to prove that Davis possessed the cocaine. We overrule Davis's fifth issue.

We next address the sufficiency of the evidence tending to show that Davis had an intent to deliver the cocaine. "Deliver" means to transfer, actually or constructively, to another a controlled substance. Tex. Health & Safety Code § 481.002. "Intent can be inferred from the acts, words, and conduct of the accused." *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). The "intent to deliver" element of an offense may be proven by circumstantial evidence, including evidence relating to the accused's possession of the contraband. *See Moreno v. State*, 195 S.W.3d 321, 325 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd); *Patterson v. State*, 138 S.W.3d 643, 649 (Tex. App.—Dallas 2004, no pet.). Additional factors that courts have considered in determining whether the accused had the intent to deliver include: (1) the nature of the location at which the accused was arrested; (2) the quantity of contraband in the accused's possession; (3) the manner of packaging; (4) the presence, or lack thereof, of drug paraphernalia for either use or sale; (5) the accused's possession of large amounts of cash; and (6) the accused's status as a drug user. *Utomi v. State*, 243 S.W.3d 75, 82 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (citing *Williams v. State*, 902 S.W.2d 505, 507 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)).

In this case, evidence tending to show that Davis had an intent to deliver the cocaine includes the following: (1) the cocaine was found in a motor vehicle, which, the jury could have reasonably inferred, was being used by Davis to transport the cocaine from seller to buyer; (2) the motor vehicle was on the road in transit at the time it was stopped, which, the jury could have reasonably inferred, tended to show that an actual drug delivery was in progress; (3) earlier that day,

17

officers had observed Davis make brief stops at other locations throughout San Angelo, which, the jury could have reasonably inferred, was evidence that Davis had been engaged in other drug deliveries throughout the day; (4) Davis had made not one but two stops at the El Patio Motel, which, the jury could have reasonably inferred based on Hethcock's testimony concerning the motel's reputation for being a location of narcotics activity, was for the purpose of obtaining cocaine for delivery to others; (5) a digital scale was found in the same location as the cocaine, which, the jury could have reasonably inferred, was being used by Davis to measure the cocaine for delivery purposes; (6) a large amount of cash was found on Davis's person, which, the jury could have reasonably inferred, was evidence that Davis had been delivering the cocaine to buyers throughout the day; (7) Detective Hethcock testified that the cash taken from Davis was in the amount of 54 twenty dollar bills and 9 one-hundred dollar bills, which, Hethcock testified, were the denominations that were used to pay for commonly sold quantities of crack cocaine; (8) Hethcock testified that the confidential informant had told him that Davis was "distributing crack cocaine" on the date in question; (9) the confidential informant had also told Hethcock that Davis's partner, "Brad," was "cutting up" or "chopping up" the cocaine, which, the jury could have reasonably inferred, was being done to make the cocaine easier to deliver in specific quantities; (10) Hethcock also testified that nothing was found on Davis's person or in his vehicle that would have enabled Davis to ingest the cocaine for his own personal use, which, the jury could have reasonably inferred, meant that Davis was delivering the cocaine for use by others; and (11) the total amount of cocaine found in Davis's vehicle and on his person was 2.18 grams, which, the jury could have reasonably inferred, was a quantity that was capable of being distributed to a drug user other than Davis. Viewing the above evidence and all reasonable inferences therefrom in the light most favorable to

18

the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Davis had an intent to transfer the controlled substance from one person to another. Accordingly, the evidence is sufficient to prove that Davis had an intent to deliver the cocaine. We overrule Davis's sixth issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   August 27, 2013

Do Not Publish