

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00706-CR

Leo **WELDER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 7, Travis County, Texas
Trial Court No. C-1-CR-10-216013
The Honorable Elisabeth A. Earle, Judge Presiding

Opinion by:  Rebeca C. Martinez, Justice

Sitting:  Catherine Stone, Chief Justice
Karen Angelini, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  August 30, 2013

AFFIRMED

Leo Welder appeals his conviction for driving while intoxicated (DWI).  We overrule Welder's issues and affirm the judgment of the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 4, 2010, at approximately 2:30 a.m., Austin police officers on horses, bicycles, and foot patrol were conducting a sweep down E. 6th Street to clear it of pedestrians and reopen it to vehicular traffic.  The police department had closed 6th Street to vehicles by placing four-foot wide barricades at each intersection between Interstate 35 and Brazos Street in order to

accommodate the crowds of pedestrians in the bar district for Labor Day weekend. Vehicles that were legally parked along 6th Street before it was closed were permitted to leave by driving westbound on 6th Street to the closest intersection and turning either right or left at the cross-street.

Welder's vehicle, a Smart Car available to the public for rent through a "car2go" program, was legally parked along the curb on 6th Street. Welder pulled out of a curb parking spot close to the corner of 6th Street and Trinity. Officer Jonathan Riley first noticed Welder's vehicle as it was proceeding through the center of the 6th Street and Trinity intersection. Welder was driving toward the barricade and a line of mounted police, and it did not appear to Riley that Welder intended to stop or turn right on Trinity, the closest cross-street. Riley stated that 6th Street was not yet open to vehicular traffic, and there were still crowds of pedestrians in the street. Riley ran over and banged on the closed driver's window to get Welder's attention and direct him to exit 6th Street by turning right on Trinity. Riley stated that, although he was banging on Welder's window and yelling "stop" and "police," Welder did not acknowledge the officer's presence and continued driving forward. Riley stopped jogging alongside the car to avoid being hit.

Another officer caught up to Welder's vehicle after about twenty yards and was able to stop it. The vehicle was still facing westbound on 6th Street. The officer opened the driver's door, placed the vehicle in park, and made contact with Welder. At that point, Riley also caught up to the vehicle. When Welder was removed from the vehicle, Riley immediately noticed that he seemed "generally confused," and had a strong odor of alcoholic beverage on his breath, glassy eyes, and slurred speech. Welder stated he had just come from one of the bars on 6th Street. Suspecting that Welder was intoxicated, Riley requested assistance from the DWI enforcement team.

Upon his arrival at the scene, Detective James Cartier was briefed by Officer Riley. Cartier similarly observed characteristics suggesting Welder was intoxicated. Specifically, Cartier noticed

a strong odor of alcoholic beverage emitting from Welder's breath and described Welder's eyes as bloodshot, glassy, and watery. Additionally, Cartier testified that Welder's speech was slurred and that Welder swayed as he stood in front of him. Welder told Cartier that he was coming from a bar, but denied having anything to drink; he also denied having any medical conditions. Welder refused Cartier's request that he perform the field sobriety tests. At that time, Cartier arrested Welder for DWI based on his personal observations, the information given to him by Riley, and Welder's refusal to perform the field sobriety tests. Because Welder also declined to give a breath or blood sample, Cartier began the process of obtaining a search warrant to take a specimen of Welder's blood. Cartier provided the information for the affidavit to his corporal, Mike Jennings, who signed and presented the affidavit to a magistrate, obtaining a search warrant authorizing the blood draw. Cartier stated that, according to Austin Police Department procedure, the affidavit must be signed by either a corporal or sergeant. Welder's blood was subsequently drawn by a registered nurse at a hospital pursuant to the search warrant.

Welder was charged by information with misdemeanor DWI. *See* TEX. PENAL CODE ANN. § 49.04 (West Supp. 2012). He filed a pretrial motion to suppress the blood test evidence, asserting the search warrant was invalid due to false statements in the supporting affidavit. After a hearing, the trial court denied the motion to suppress the blood evidence obtained pursuant to the search warrant. Welder proceeded to trial. At trial, the chemist testified his analysis of Welder's blood revealed a 0.24 blood alcohol content. A jury found Welder guilty, and the trial court assessed punishment at twenty-four days' confinement in the Travis County jail plus a $200 fine, and suspension of Welder's driver's license for 180 days. Welder now appeals.

### SUPPRESSION OF EVIDENCE

On appeal, Welder asserts the trial court erred in declining to suppress (1) the blood evidence because the affidavit underlying the search warrant contained material false statements,

(2) all evidence derived from his unlawful detention, and (3) the results of the blood analysis because the chemist did not retain the raw data on which the analysis was based.

***Affidavit for Search Warrant (Blood)***

In his first issue, Welder asserts that the affidavit underlying the search warrant contained three material misrepresentations made in reckless disregard for the truth: (1) that Cartier "personally observed" Welder commit the DWI offense; (2) that 6th Street was "closed to vehicular traffic" at the time of the offense; and (3) that Welder was intoxicated by a substance other than alcohol. Welder asserts that when these false statements are disregarded, the affidavit no longer supports issuance of the warrant. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Thus, Welder contends the court erred in refusing to suppress the blood evidence obtained pursuant to the warrant. Welder also argues the computer program used by the Austin Police Department to generate search warrants and affidavits is against public policy as it increases the likelihood of false or inaccurate information.

### *Standard of Review*

Generally, in reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard, giving almost total deference to the court's determination of historical facts that are supported by the record and reviewing the court's application of the law to the facts de novo. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011); *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). A unique standard of review applies, however, when a motion to suppress challenges a magistrate's issuance of a search warrant. *State v. Webre*, 347 S.W.3d 381, 384 (Tex. App.—Austin 2011, no pet.). In determining whether probable cause existed to support issuance of the warrant, the trial court makes no credibility determinations because its review is limited to the four corners of the supporting affidavit. *McLain*, 337 S.W.3d at 271; *Hankins v. State*, 132 S.W.3d 380, 388 (Tex. Crim. App. 2004). If the affidavit contains false statements made in

reckless disregard of the truth, such statements must be disregarded and the remainder of the affidavit must be sufficient to establish probable cause for issuance of the search warrant. *Franks*, 438 U.S. at 155-56.

Review of the magistrate's decision to issue a warrant is highly deferential due to the constitutional preference for a search conducted pursuant to a warrant as opposed to a warrantless search. *McLain*, 337 S.W.3d at 271; *see Illinois v. Gates*, 462 U.S. 213, 236 (1983) (cautioning reviewing courts that negative attitude toward warrants is inconsistent with Fourth Amendment's strong preference for searches conducted pursuant to a warrant). As long as the magistrate had "a substantial basis for concluding that probable cause existed," the magistrate's probable cause determination and issuance of the warrant will be upheld. *McLain*, 337 S.W.3d at 271-72 (probable cause exists when, under the totality of the circumstances presented in the affidavit, there is a fair probability that evidence of a crime will be obtained in the specific location); *Rodriguez v. State*, 232 S.W.3d 55, 59–60 (Tex. Crim. App. 2007) (noting that magistrate's finding of probable cause is given great deference "to encourage police officers to use the warrant process rather than making a warrantless search and later attempting to justify their actions by invoking some exception to the warrant requirement"). Under this highly deferential "substantial basis" standard, the reviewing court must defer to the magistrate's decision even if it might reach a different result upon de novo review. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010).

*Analysis*

Austin patrol vehicles are equipped with a computer program called "FASTER." After information is entered into the template, the program provides officers with a blood search warrant and a supporting affidavit. At the suppression hearing, Cartier testified that, after determining he had probable cause to request a search warrant to draw Welder's blood, he met with his supervisor,

Corporal Jennings, to prepare an affidavit and a search warrant. Cartier completed the initial information and then gave the documents to Jennings, who filled out the remaining blanks, signed the affidavit, and presented the completed documents to a magistrate. Cartier testified that any typed information appearing on the form was either information he input based on his own observations and the information he obtained from Riley, or was language already contained within the template provided by the computer program. Anything handwritten on the form was filled in by Jennings.

*Alleged Misrepresentation No. 1*

The affidavit signed by Jennings and presented to the magistrate in support of the search warrant is three pages long. The first section challenged by Welder provides:

> My belief of the foregoing statement [that Welder committed driving while intoxicated] is based upon . . . information provided to me by Officer J. Cartier 3817, an officer working for Austin Police Dept. who personally observed such offense.

Welder complains that this section falsely states that Officer Cartier "personally observed" Welder driving his vehicle while intoxicated. He points to the evidence at the suppression hearing showing that Cartier arrived after Welder had already been stopped and removed from his vehicle. Indeed, Cartier acknowledged at the hearing that he did not personally see Welder driving, but did observe signs of intoxication when he interacted with Welder outside the vehicle.

We do not view the information contained within the four corners of the affidavit in a hyper-technical manner, viewing a single sentence or phrase in isolation or strictly applying the rules of grammar and syntax. *McLain*, 337 S.W.3d at 271-72. Rather, we view the totality of the circumstances contained within the affidavit in a common sense manner, deferring to all reasonable inferences the magistrate could have drawn. *Id.* at 271. It is the collective information known to the cooperating officers, reflected within the four corners of the affidavit, that is

considered in determining whether probable cause exists. *Wiede v. State*, 214 S.W.3d 17, 27-28 n.50 (Tex. Crim. App. 2007); *Woodward v. State*, 668 S.W.2d 337, 344 (Tex. Crim. App. 1984); *Wilson v. State*, 98 S.W.3d 265, 271 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Cartier stated at the suppression hearing that the program "pre-filled" the language stating that he "personally observed" the DWI offense. Looking at the affidavit, it is apparent that such phrase was already typed in as part of the form. Moreover, right below the challenged statement concerning Cartier appears the more detailed statement that, "Officer Riley 5665, observed Leo Welder III driving . . . [a] White 2009 Smart Car TX: BG8K072 upon [the] 300 block E. 6th Street, a public place in Austin, Travis County, TX." When viewed as a whole, and not in a hyper-technical manner, the affidavit shows that Riley personally observed Welder driving, and the affiant Jennings was relying on the collective observations of both Officers Cartier and Riley. *See Woodward*, 668 S.W.2d at 344; *Wilson*, 98 S.W.3d at 271. Thus, we reject Welder's contention that the challenged statement constitutes a misrepresentation in the affidavit.

*Alleged Misrepresentation No. 2*

Secondly, Welder complains that the affidavit falsely states that 6th Street was "closed to vehicular traffic" when Riley observed Welder driving westbound in the 300 block of E. 6th Street. Welder argues the evidence showed the police were in the process of removing the barricades and re-opening the street to vehicles, and that traffic was flowing at the nearby intersection of San Jacinto and E. 6th Street; therefore, he contends the street was not "closed." The succeeding portion of the affidavit states that "E. 6th St. was clearly marked as closed to vehicular traffic by large orange and white barricades," and explains in detail that "mounted patrol units as well as several marked police units were still in the process of clearing the street of pedestrian traffic prior to opening the street to vehicular traffic." The affidavit goes on to state that, "It was still clearly dangerous for a vehicle to be driving on the 300 block of E. 6th St. during this time due to the

heavy pedestrian traffic." In addition, at the suppression hearing both officers repeatedly testified that the street was not yet open to vehicular traffic when Welder was stopped. We further note that Welder concedes in his brief that the police were "in the process of reopening Sixth Street by removing the barricades" at the time of his stop, which implies the street was not yet re-opened. Welder also argues Riley testified that vehicles legally parked on 6th Street before it was closed were allowed to be driven to the closest intersection in order to exit 6th Street. However, Riley also stated that he observed Welder drive past the closest corner intersection. We conclude the challenged statement, viewed in the context of the whole affidavit, does not constitute a misrepresentation.

*Alleged Misrepresentation No. 3*

Finally, Welder complains that the affidavit states he was intoxicated "by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance . . . ." Welder argues that language incorrectly suggests that Cartier believed Welder was under the influence of a controlled substance or drugs, and points out that Cartier testified that he suspected Welder was intoxicated solely by alcohol.

As explained by Cartier at the suppression hearing, the computer program pre-filled the challenged language in the affidavit. The language tracks the statutory definition of intoxication in the DWI statute which provides several alternative means of becoming intoxicated. *See* TEX. PENAL CODE ANN. § 49.01(2)(A) (West 2011) (defining "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body"). The statute sets out a number of intoxicating substances. The particular substance that causes the intoxication is not an element of a DWI offense; it is merely an evidentiary matter. *Gray v. State*, 152 S.W.3d 125, 132 (Tex. Crim. App. 2004). Therefore, an affiant need not specify

the substance by which a defendant has become intoxicated. *See id.* Moreover, the affidavit lists the possible substances leading to Welder's intoxication in the disjunctive. The challenged language does not amount to a misrepresentation.

*Computer Program*

Finally, Welder argues that the Austin Police Department's use of a computer program to quickly generate search warrants increases the likelihood of inaccurate information being used to obtain invasive blood search warrants, and is thus against public policy. Because we have concluded the affidavit did not contain any material misrepresentations, we need not reach this issue.

**Unlawful Detention**

In a separate issue, Welder asserts the trial court erred in declining to suppress *all* the evidence stemming from his detention, which he contends was unlawful because it was not based on any traffic violation. This ground was not included in Welder's written motion to suppress, and although briefly raised at the conclusion of the suppression hearing, no adverse ruling was obtained from the trial court. Therefore, the issue was not preserved, and nothing is presented for our review. *See* TEX. R. APP. P. 31.3(a).

**Admission of Blood Test Results**

Finally, Welder asserts the trial court should have suppressed the results of the blood analysis because the chemist intentionally destroyed the raw electronic data upon which his analysis was based, thereby precluding Welder from effectively confronting the chemist about the accuracy of his analysis and depriving him of due process. We note that Welder is not arguing on appeal that the blood test results should have been excluded due to foundational defects, most specifically, the chemist's failure to produce the correct calibration file for the date of Welder's

blood analysis. Although Welder objected on this basis in the trial court, he has abandoned that argument on appeal.

The State concedes in its brief that it is undisputed that the raw data created by the gas chromatography machine was deleted from the computer's hard drive. The State argues that deletion of the raw data, even if it amounted to destruction of evidence, did not violate Welder's due process rights because he has not shown that (i) the raw data was exculpatory, (ii) he was prejudiced by the absence of the raw data, and (iii) that the State acted in bad faith.[1]

### *Standard of Review*

We review a trial court's ruling on a motion to suppress for abuse of discretion using a bifurcated standard. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App.1997). We give almost total deference to the trial court's determination of historical facts that are supported by the record, especially when based on an evaluation of credibility and demeanor, but we review de novo the trial court's application of the law to the facts. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). We view all the evidence in the light most favorable to the trial court's ruling, and assume the court made implicit findings that support its ruling. *Id.*; *Tucker v. State*, 369 S.W.3d 179, 184 (Tex. Crim. App. 2012). A trial court's ruling will be upheld so long as support exists in the record and it is correct under any applicable theory of law. *State v. Iduarte*, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008).[2]

---

[1] The State also argues that deletion of the raw data is immaterial because the lab preserved the chromatogram, which is the computer software program's graphical representation of the raw data; therefore, the deletion of the raw data does not amount to destruction of evidence as it was merely "duplicative evidence." In its brief, the State asserts, "Whether the computer presents the data from the blood-alcohol tests in a graphical format or as a list of numerical measurements is immaterial; both representations contain the data underlying the test results." We disagree that the deleted data was merely duplicative.

[2] We recognize that the State contends the appropriate standard of review is abuse of discretion because the trial court made a trial ruling on the admissibility of the blood test evidence. *See Davis v. State*, 329 S.W.3d 798, 803 (Tex.

*Applicable Law:  Destruction of Evidence*

In determining whether the loss or destruction of potentially exculpatory evidence violates a defendant's due process rights, courts weigh the following three factors: (1) the likelihood that the lost evidence was exculpatory; (2) the likelihood that the defendant was significantly prejudiced at trial by the absence of the evidence; and (3) the level of government culpability. *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *Ex parte Napper*, 322 S.W.3d 202, 229-231 (Tex. Crim. App. 2010) (orig. proceeding); *Saldana v. State*, 783 S.W.2d 22, 23 (Tex. App.—Austin 1990, no pet.) (per curiam).  "To meet this standard of constitutional materiality . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.  When the destruction of potentially useful evidence is at issue, the defendant must show "bad faith" on the part of the State in destroying the evidence in order to establish a due process violation.  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

The Texas Court of Criminal Appeals has repeatedly applied the *Youngblood* standard.  *Ex parte Napper*, 322 S.W.3d at 229, 231-35 (noting long history of the bad faith requirement).  The Court has recognized that "'[p]recisely what constitutes 'bad faith' is not clear.'"  *Id.* at 231 (quoting George E. Dix and Robert O. Dawson, 42 Texas Practice, 2d ed., § 22.63 (2001)).  However, as explained by the Court, it is "more than simply being aware that one's action or inaction could result in the loss of something that is recognized to be evidence." *Id.* at 238.  Bad faith requires a showing of "some sort of improper motive, such as personal animus against the

---

Crim. App. 2010).  The record shows the trial court intended its ruling to be a suppression ruling on Welder's request to suppress the blood test evidence and the chemist's expert testimony concerning the blood test results.  We note, however, that under either standard of review, our conclusion based on the absence of any evidence of bad faith would be the same.

defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Id.* "Bad faith cannot be established by showing simply that the analyst destroyed the evidence without thought, or did so because that was the common practice, or did so because the analyst believed unreasonably that he was following the proper procedure." *Id.* When conduct can, at worst, be described as negligent, the failure to preserve evidence does not rise to the level of a due process violation. *Youngblood*, 488 U.S. at 58.

### *The Record*

About one year before trial, on July 22, 2011, Welder filed a pretrial motion stating that the Austin Police Department's forensic lab had "destroyed and/or deleted the raw data obtained by said Lab in testing the blood of Defendant" and asserting that, "[w]ithout said raw data Defendant is unable to reconcile the chromatograph produced herein and run his own evaluation on results obtained by the Austin Police Department using that raw data produced by them on their gas chromatograph." Welder requested the trial court to order the lab "to extract the raw data from its hard drive or order a copy of the hard drive be made available to Defendant, so that he might extract it and evaluate same." The motion was granted on December 22, 2011, but the order contains a handwritten notation, "agreed per state however, the lab doesn't keep raw data."[3] Previously, on November 17, 2011, the court signed an order instructing the Austin Police Department lab to forward a sufficient portion of Welder's blood specimen to the Institute of Forensic Sciences, Medical Examiner's Office/Crime Investigation Laboratory in Dallas, Texas. At trial, it was not clear whether this lab ever performed an independent analysis.

Before trial began, Welder filed a pretrial motion in limine to preclude any testimony about the blood test results before conducting voir dire on the issue of preservation of the raw data. The

---

[3] The record does not show that Welder filed a pretrial motion to preserve the raw data.

motion in limine was granted. During trial, the court conducted a hearing outside the jury's presence at which the chemist for the Austin Police Department Crime Lab, Glenn Harbison, testified that he routinely deletes the raw data created by the gas chromatography machine and retains only the chromatogram, which is the graphical representation of the results. Harbison explained that, after the blood sample and other components of the analysis are injected, they travel through a long tube, eventually hitting a flame which creates an electrical charge that is then stored in the computer; the computer's software program measures the data from the electrical charge and produces a picture graph called a chromatogram. Harbison explained that once the chromatogram is printed, the raw electronic data that forms the basis for the chromatogram is routinely deleted to create space for new cases according to the standard practices of the lab. The lab does not back up the raw data on CD's or DVD's. Harbison stated that the lab keeps the chromatograms in the electronic case file indefinitely and that is adequate to comply with the applicable regulations and lab certifications.

At the conclusion of the voir dire hearing, Welder's counsel moved to suppress the blood test results, stating "the chemical lab results are not admissible and should not be gone into because of the destruction of the evidence that I need to verify his chromatograms. Without those, they have destroyed this evidence. I cannot verify, prove, or disprove their chromatograms." The State argued the lab did not destroy any evidence that is required to be preserved. The trial court denied Welder's motion, finding that "there was no destruction of evidence."

At trial, the 0.24 result of the blood analysis was admitted through the testimony of Harbison. Counsel for Welder developed, on voir dire and in cross-examination before the jury, the fact that Harbison had deleted the raw data and did not bring the calibration chromatograms to court with him showing the machine was working properly. Harbison stated he did not believe the calibrations were covered by the court order. Defense counsel objected outside the jury's

presence that he could not proceed with cross-examination until Harbison provided the calibration file; the objection was denied. Welder's counsel again objected in front of the jury that "there is no validation of this [0.24 result] that's been provided that he has testified to or produced that gives us any authority to accept these results." The court again overruled the objection, and the blood test results were admitted.

During cross-examination, defense counsel questioned Harbison about the lab's policy on deleting the raw data and the consequence of preventing a defendant from challenging or replicating a blood analysis from the raw data. Harbison replied that a defense expert could independently analyze the results from the printed chromatogram. Harbison further testified that under lab policies calibrations are conducted with each run, which informs the chemist whether the machinery is operating properly at the time of the analysis. Harbison conceded he did not bring the calibration file associated with Welder's chromatogram done in April 2011. After some confusion, Welder's counsel referenced a calibration file dated February 2011 that had been produced in discovery. Harbison stated that was the wrong calibration file because he runs a new calibration with every batch of blood samples.

During the defense case, Amanda Culbertson, the defense expert, testified that in her experience labs always keep the raw data underlying the chromatograms and that the data may easily be backed up on CD's or DVD's and indefinitely stored in that form. She stated at least one month's worth of raw data would fit on a single CD. Culbertson testified that without the raw data she was unable to independently evaluate Harbison's analysis of Welder's blood. She also testified that not only were the calibration chromatograms missing, but there were no details on the controls used within the lab, the certifications of the pipettes used, etc. Culbertson stated she was not asked to run an independent analysis of Welder's blood, and could not have done so because she does not have a lab.

*Analysis*

Even if we assumed that Welder can establish that the deleted raw data was exculpatory and that his confrontation rights were prejudiced by its absence, he cannot establish that the data was destroyed in bad faith. The record shows that Harbison's deletion of the raw data was done routinely to clear space on the computer's hard drive, and was done according to the lab's procedures. The lab supervisor agreed with Harbison's statement that the lab policy includes deletion of the raw data to make room on the hard drive. There is nothing in the record to show Harbison had an improper motive or desire to prevent Welder from obtaining the raw data, or to support a reasonable inference that Harbison's intentional deletion of the data according to lab policy was done in bad faith. *See Trombetta*, 467 U.S. at 488 (evidence showed authorities did not destroy breath samples in conscious effort to suppress exculpatory evidence, but rather in accord with normal practice).

Welder argues that "bad faith can be presumed from the chemist's intentional and purposeful act of deleting the electronic evidence." Welder argues that his motion to extract the raw data was pending before the likely date that Harbison deleted the raw data. This constitutes pure speculation. Even if that were so, it does not lessen Welder's burden to affirmatively show bad faith. *See Illinois v. Fisher*, 540 U.S. 544, 548 (2004) ("We have never held or suggested that the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of the police); *see also Martin v. State*, No. 03-10-00420-CR, 2011 WL 3518050, at *5 (Tex. App.—Austin Aug. 10, 2011, no pet.) (mem. op., not designated for publication) (explaining that even if knowledge of pending subpoena was some evidence of bad faith, court would not have abused its discretion in finding it was outweighed by other evidence in record tending to show, at worst, negligence). There must be some evidence in the record from which a reasonable inference of bad faith can be drawn, and there is none here. *See Ex parte Napper*, 322 S.W.3d at 238.

While we certainly do not condone the lab's practice of deleting the raw data rather than easily retaining it on back-up CD's or DVD's, we simply cannot say, based on this record, that there is any evidence that Harbison's deletion of the raw data was done in bad faith. *See Youngblood*, 488 U.S. at 57-58 (police failure to refrigerate clothing and perform tests on semen samples could at worst be described as negligent, and in the absence of bad faith there was no due process violation); *see also Ex parte Napper*, 322 S.W.3d at 238 (crime lab employees did not act in bad faith by consuming entire DNA sample, thereby preventing additional testing). Accordingly, we conclude Welder has failed to establish that the failure to preserve the raw data constitutes a due process violation. The trial court did not err in admitting the blood test results and the related expert testimony.

## CONCLUSION

Based on the foregoing reasons, we overrule Welder's issues on appeal and affirm the trial court's judgment.

Rebeca C. Martinez, Justice

DO NOT PUBLISH